[L. A. No. 16712.   In Bank.—September 29, 1938.]

FRED J. FURMAN, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

Marcus, Rabwin & Nash and Eugene H. Marcus for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—This proceeding is a review (as distinguished from *certiorari*) of an action of the board of governors of The State Bar, wherein by a vote of ten members voting in favor thereof, as opposed by a vote of three members, it was recommended to this court that the petitioner herein, Fred J. Furman, "be disbarred from the practice of the law in the State of California". Prior to the presentation to this court of the said recommendation, the local administrative committee of The State Bar before which had been produced practically the identical evidence on the hearing of the charges that had been preferred against petitioner as had been presented to the board of governors, had made its recommendation "that the respondent (Fred J. Furman) be publicly reprimanded".

The specific offense of which petitioner was found guilty of having committed was that "by deliberate fraud perpetrated by him upon Thelma W. Clark, and by false or exaggerated testimony *upon the hearing before the Montana Court*" (Italics added), petitioner had obtained an award of $82,500 as attorney's fees which purportedly had been earned by him as an attorney who represented the executors of the will of William Andrews Clark, III.

■ Other than a challenge to the sufficiency of the evidence to support the determination that was reached by the board of governors of The State Bar, no question is suggested regarding the propriety of the recommendation that was made by the said board. It therefore becomes advisable to consider the evidence which tended to establish the truth of the ultimate fact upon which the recommendation was made to rest; and with respect thereto, the patent fact that a considerable portion of the testimony that was received in that behalf was seriously and appropriately questionable regarding both its accuracy and its truth, is not necessarily determinative of the question that is involved in this proceeding. In the case entitled *Fish* v. *State Bar*, 214 Cal. 215 [4 Pac. (2d) 937], this court said, "It has repeatedly been indicated by this court that the board of governors, when sitting in discipline cases, is an administrative body acting as the administrative arm of this court. Its findings, although based on conflicting evidence, are not binding on this court. . . . In other words, in such cases this court can and always does pass upon the weight of the evidence." (See, also, to the same effect: *Bentson* v. *State Bar*, 216 Cal. 58 [13 Pac. (2d) 512], *Clark* v. *State Bar*, 214 Cal. 281 [4 Pac. (2d) 944], *In re Shattuck*, 208 Cal. 6 [279 Pac. 998], *In re Petersen*, 208 Cal. 42 [280 Pac. 124], *Gray* v. *State Bar*, 7 Cal. (2d) 177 [59 Pac. (2d) 1033], *In re Stafford*, 208 Cal. 738 [284 Pac. 670], *Ring* v. *State Bar*, 218 Cal. 747 [24 Pac. (2d) 821], and *Herrscher* v. *State Bar*, 4 Cal. (2d) 399 [49 Pac. (2d) 832].) Although in many important respects contradictory one of the other, neither of the respective findings that were made by the local administrative committee, or by the board of governors, is conclusive on this court, nevertheless, permitting the existence of a mental reservation regarding such impeached evidence, holding it in the balance, and not according to it the weight to which unassailed evidence ordinarily is entitled, if the remainder of the entire evidence be either legally sufficient in itself, or be sufficiently corroborative of that which is under suspicion, the result should be that the conclusion upon which the recommendation by the state board is founded, at least should be accorded persuasive force by this tribunal.

■ Reverting to the finding of fact, in substance, that petitioner committed a "deliberate fraud" upon Thelma

Clark, the record reveals the fact that according to her testimony the fees that petitioner told her would be allowable, and to which petitioner and the executors together would be entitled would amount to a sum not less than $35,000 nor more than $50,000. Although to some extent, that testimony may be said to be inferentially (but neither directly nor convincingly) corroborated by documentary evidence, nevertheless, by at least the great preponderance of evidence to the contrary, that testimony is not worthy of credence. Other indisputable evidence in the case utterly refutes the verity and reliability of such a conclusion. However, the finding that "deliberate fraud" was perpetrated by petitioner was not entirely dependent upon that isolated fact, but was assisted by extrinsic facts. In that connection, it appears that the principal portion of the estate was being administered in the state of Montana; that at the time when the amount of fees was proposed to be fixed by the probate court, nine other separate and distinct orders were sought in the matter of the administration of the estate; that Thelma W. Clark, who was the principal legatee of the estate, was absent from both the state of Montana and the state of California; that although in accordance with the pertinent statutes of Montana, notices were properly posted of the application of petitioner for an order by which he would be awarded not only ordinary fees, but also compensation for the performance by him of asserted extraordinary services, he did not send to Thelma W. Clark either a copy of his said petition to the latter effect, or personally acquaint her with his intention in the premises in that regard, but that to the contrary, a communication relative to the matter that was sent by petitioner to Mrs. Clark, although correctly containing a proper reference to the fact that at a contemplated hearing of the matter on a stated date, the amount of fees to be awarded to petitioner would be adjudged, no direct or express intimation was given, nor did Mrs. Clark have any knowledge of the fact that extraordinary compensation would be asserted to have been earned. Furthermore, as an inference or conclusion deducible from such facts, it is contended that such omission on the part of petitioner was intended to deceive Mrs. Clark with reference to the amount of fees that would be claimed by him; and that in fact such action on the part of petitioner actu-

ally did deceive Mrs. Clark in that regard, and prevented her from contesting any asserted right on the part of petitioner to such extra allowance as might be, and in fact was made to him on account of fees; and finally, that in thus "preventing" Mrs. Clark from contesting the claim of petitioner in that regard, not only was she defrauded, but as well, extrinsic fraud was committed on the probate court. With reference thereto, the record herein reveals the fact that in a proceeding known as "supervisory control", and which in its effect was in the nature of an appeal from the order by which the fees of petitioner had been determined, after reviewing the evidence that had been presented in connection with the matter, in the case of *State ex rel. Clark* v. *District Court, etc.*, 102 Mont. 227 [57 Pac. (2d) 809], the Supreme Court of Montana declared "that the order fixing the attorney fees was secured as a result of *constructive* fraud, extrinsic in character. . . . " (Italics added.) And in a similar matter before the same court which involved an order by which the fees of one Regis, who was one of the executors of the will in the said estate, had been fixed, among other things, as a predicate for the conclusion that petitioner was guilty of *constructive* fraud, it was declared that "It would seem that, in the absence of statutory authority to the contrary, the only notice (to Mrs. Clark) which would suffice as accomplishing the purpose of notice in such a case as this would be actual notice brought home to the interested party." (*State* v. *District Court, etc.*, 102 Mont. 74 [55 Pac. (2d) 1295].)

On the hearing before the board of governors of The State Bar, evidence also was introduced of the fact that although at the time when the original order was made by which the attorney's fee was fixed by the court in the sum of $82,500, on a rehearing of the petition for that purpose, the petitioner was allowed a fee for his services in that regard of only $20,000. Furthermore, in the complaint in an action which thereafter at the instance of Mrs. Clark was brought against petitioner to recover a judgment against him for the difference between the amount which he had received under the first order and that which finally it had been adjudged he was entitled to receive for his services, in substance it was alleged that in pursuance of a scheme and plan to defraud Mrs. Clark, the petitioner herein had wrongfully

and fraudulently obtained the original order of the Montana court by which he was authorized to and did secure the sum of $82,500 as attorney's fees from the estate which he was representing; whereas, as compensation for such services, in justice he was entitled to the sum of $20,000 and no more. In answer to the said complaint an unverified general denial was filed. Quoting from the brief filed herein by the respondent board, it further appears that "Neither petitioner nor his counsel appeared at the trial. Judgment was ordered for Thelma W. Clark as prayed. Proposed findings of fact and conclusions of law, and a proposed judgment were served on petitioner's attorney on February 8, 1937. The proposed findings found that petitioner had wrongfully and fraudulently and in pursuance of a scheme and plan to defraud Thelma W. Clark and the estate of W. A. Clark, III, deceased, obtained $82,500 belonging to Thelma W. Clark and to said estate, and found the facts substantially as heretofore set forth herein. Neither petitioner nor his counsel proposed amendments to said findings. Thereafter Mrs. Clark had judgment in part that petitioner had secured the said award of $82,500 to himself as an attorney's fee by fraud practiced by him on his client, the said Thelma W. Clark, and that at all times between May 20, 1935, and September 10, 1936, petitioner was a trustee for the sum of $72,199.36, paid to him immediately after said award for the use and benefit of said Thelma W. Clark and the estate of W. A. Clark, III, deceased. Judgment was entered after the court had made its findings of fact and conclusions of law as stated above. Notice of entry of said judgment was served on petitioner's attorney on February 25, 1937. No appeal was taken from said judgment, and thereafter the judgment was settled by petitioner's paying Thelma W. Clark $15,000 and executing and delivering to her two promissory notes payable within two years for approximately $4,300.00. On April 16, 1937, a satisfaction of said judgment was filed."

On the other hand, and without reference to any conclusion that was reached by the Supreme Court of the State of Montana with respect to the necessity of actual notice to Mrs. Clark of the intended application for an order by which the attorney's fees to be allowed to petitioner would be fixed, the record reveals the indisputable fact that Mrs. Clark did receive a specific written notice to the effect that at the time

stated therein petitioner would make application to have the amount of his fee determined by the court. It also is in evidence ''That under the probate practice of the State of Montana it is not necessary or usual for an attorney to prepare and file a petition for fees; that all that is required is that the attorney upon the hearing to fix fees, introduce evidence bearing upon the nature and extent of his services and that based upon his evidence the court makes its award. · The only reason petitioner prepared and filed a petition in this case was because he had promised the complaining witness all along that this was the way he would have his fee determined.''

In presenting his said application, the petitioner suggested no sum as suitable or proper. His request or petition was that he be awarded a reasonable amount of compensation for his services; and as an aid to a determination of the amount of fees to which petitioner should be entitled, the nature and the extent of the services that had·been rendered were fully and completely set forth. Furthermore, it is noteworthy that on the hearing of the matter, not two attorneys, as was customary in such matters in the state of Montana, but five of the lawyers of the local Montana Bar were called as witnesses, who respectively gave testimony to the effect that a sum not less than $85,000, and from that amount up to $110,-000 would be a reasonable value to be placed upon the services that purportedly had been rendered by the petitioner. The appraised value of the total estate was over $1,100,000, of which approximately $857,000 was in the state of Montana. In addition thereto, the local administrative committee of The State Bar which heard the evidence and saw the witnesses, in rendering its decision with reference to the value of the services of petitioner, in part made the following finding of fact: ''that the administration of the estate of said deceased continued actively for substantially three years; that there were many difficult problems of taxation and administration involved; that respondent (the instant petitioner) conducted the legal affairs involved in the handling of said estate ably and well, devoting practically all of his time during said period to such work; that the results which respondent obtained for the benefit of the estate were excellent, and that the petition of respondent in making application for and receiving a fee of $82,500 from the Montana court of

his entire fee for the original probate in Montana and the ancillary proceedings in California and Arizona, was justified".

Considering such facts, and especially that in pursuing the course that was followed by petitioner in the matter, it becomes apparent that he was doing that which not only was in accord with the usual and customary practice in the state of Montana, but also that nothing to the contrary thereof, in anywise, theretofore had ever been prescribed or required either by statutory provision or by judicial fiat, it is impossible to legally adjudge that in that respect petitioner was guilty of the commission of a "deliberate fraud". In the face of the local practice and in the absence of statutory provision by which petitioner *might* have been required to do otherwise than the record reveals was the course that was pursued by him, it would be a straining of the unwritten law of legal ethics to the breaking point, to concur in the conclusion that petitioner was guilty of any infraction of even the moral law.

In such circumstances, the final question of whether the recommendation of disbarment of petitioner should be adopted as the judgment of this court, depends for its solution primarily on whether the conclusion which was reached by the board of governors to the effect that petitioner gave "false or exaggerated testimony upon the hearing before the Montana court", is sufficiently supported by the evidence.

At the outset, it may be noted that at least two objections very appropriately might be interposed to the finding of the said ultimate fact to which attention just has been directed: (1) that nowhere within either the detailed "findings of fact" or within the said ultimate fact, may be discovered in what particular respect petitioner gave either false or exaggerated testimony. In other words, for aught that appears, petitioner's "testimony" in its entirety may have been both false and exaggerated. But equally, it may be surmised that his testimony may have been objectionable in that regard either in a dozen or so particulars, or possibly in one or two only. Everything in that regard is open to conjecture; and petitioner is afforded no fair opportunity to establish his point regarding the asserted lack of evidence to support the conclusion that was reached by the board of bar governors; (2) the ultimate fact or conclusion that petitioner

gave "false or exaggerated testimony upon the *hearing* before the *Montana* court" (emphasis added) was not only at variance with the *charge* upon which petitioner was prosecuted, but in addition thereto was not supported by any evidence, either by transcript of the record of the proceedings or by oral testimony, regarding what, if any, testimony petitioner gave at such hearing. In those respects the record herein discloses that by means of a "notice to show cause" it was alleged that, "On May 20, 1935, you presented to the Probate Court in Montana an eighteen page verified petition for fees and in said petition you set up many false or exaggerated claims to benefits which had accrued to said estate by reason of your efforts. . . . On May 20, 1935, without any notice or knowledge on the part of Thelma W. Clark you appeared in the Montana Probate Court and after you had testified to said false or exaggerated services set forth in your petition certain attorneys whom you had called as witnesses for the occasion, gave as their opinion that the reasonable value of said services which you described were sums varying from $85,000 to $110,000. Based upon this showing, said Court entered an order awarding you an attorney's fee of $82,500.00 and ordering the executors to pay you this sum."

As far as may be ascertained from the entire record herein the actual prosecution of petitioner was directed not with reference to any "testimony" that he ever gave either in Montana or elsewhere, but rather was limited and confined to general statements that were contained in his petition to fix attorney's fees which he had presented to the Montana court. It thus becomes apparent that in those respects petitioner has just cause for feeling aggrieved.

But casting aside and leaving out of consideration such matters as may be deemed to constitute "mere technicalities", it may be well to devote some attention to the facts and the circumstances of each of four different "claims" that were specified in the said petition that was presented by petitioner to the Montana court, and upon the allegations which therein are contained,—with reference to which the respondent board of governors now confines its charges against petitioner and asserts that he gave "false or exaggerated testimony"; and which "testimony", it is contended, furnishes a foundation for its recommendation of petitioner's proposed disbarment:

(1) The apartment lease: In that regard, petitioner's statement in his petition to the Montana court was as follows: "Mr. Clark's lease on the apartment at 1416 North Havenhurst Drive called for $500 a month rental and W. A. Clark, III, had not been able to break it or buy his peace during his lifetime. He, and after him Executor Regis and I, could not find a sub-lessor and we could not divide the apartment (it occupied an entire floor) into smaller units that could be rented. We stopped paying rent. In his lifetime W. A. Clark, III, had consulted me about breaking the lease. He insisted he had been misled into signing it; declared that he had an oral agreement allowing him to cancel at will. Undoubtedly he had been misled into the belief that the parol promise to permit cancellation was a binding promise. After many conferences with the landlords we reached the conclusion that a trip to New York City to see the person chiefly interested in the lease would result favorably. Executor Regis and I conferred with the residuary legatee (Mrs. Clark). She opposed the trip to New York City, declared it would prove fruitless and expensive and that she would eventually have to bear the expense. Executor Regis and I had neither time nor opportunity to ask authorization of this or any Court to make the deal. Executor Regis and I assumed the responsibility of settling. We had no money. We borrowed for the estate on the endorsement of one Clark J. Bonner the sum of $8,500 and Executor Regis, with my approval but contrary to the wishes of residuary legatee, left at once for New York City where he bought for $8,500 the lease that called for $21,500 rentals. Had the effort failed we would doubtless have had to bear the expense personally. No claim was presented to the estate on this lease because the residuary legatee (Mrs. Clark) was a party to the lease and personally liable for the full rental. The saving was $13,000. We have since petitioned this Honorable Court to confirm the loan and the deal."

On the hearing before the local administrative committee the petitioner gave testimony which in detail was entirely confirmatory of the said statement made by him in his said petition. No testimony other than that which was given by Mrs. Clark was in the least contradictory thereof. In that regard, she testified that by virtue of the settlement she did not "consider" that the full $13,000 had been saved; that she "had

other ways'' that she could have saved on the claim; that
''the settlement was not my (her) original idea at all''; that
although she knew ''they'' were trying to effect a settlement
she had nothing to do with the negotiations; that ''Mr. Regis
did the work of settling the lease''. It thus becomes apparent that as far as the foregoing claim is concerned, the
specific charge against petitioner, if not entirely unfounded,
is so lacking in evidentiary support as to merit no serious
consideration.

(2) The Smainia (or Smainis) claims: In this matter, petitioner's statement in his petition for the fixing of fees was as
follows: ''The claims of G. A. Smainis against the estate were
extremely annoying and burdensome. In his lifetime Mr.
W. A. Clark, III, with Smainis had organized the Casco Development Company. The name was made from the initials
Clark and Smainis Co. It was organized to exploit natural
resources and to engage in about all lawful enterprises.
Smainis had a contract to act as an officer at a salary of
$6,000 per annum. Among other activities it traded in the
stock market. It borrowed large sums from the Citizens National Trust & Savings Bank of Los Angeles, and at Mr.
Clark's death owned [owed?] $28,500 secured by deposit of
collateral owned by the Casco Company, by deposit of bonds
owned by Mr. Clark and secured by the personal guarantee
of Mr. W. A. Clark, III.

''On May 15, 1932, the date of Mr. Clark's death, all the
collateral was insufficient by thousands of dollars to pay their
indebtedness to the bank. Under the will Smainia would come
into control of the Casco Company. Once in control
he could fix his salary at any sum. He claimed the Casco
Company owned [owed] him $18,400 plus. At the expiration of one year he demanded delivery of his Casco stock.
We advised him repeatedly that we would transfer the shares
to him only when compelled by Montana's highest court unless he agreed by proper contracts to protect the estate and
the residuary legatee. The only chance the estate had to
salvage anything was to buy its peace. The estate and the residuary legatee agreed to pay $13,000 and deliver all Casco
stock to Smainis and agreed to assume the debt at the Citizens National Trust & Savings Bank. The Casco Company
and the Smainis in consideration of the foregoing agreed to

sell and assign all collateral owned by the Casco Company to the residuary legatee.

"To consummate the transaction it was necessary to petition this Honorable Court for partial distribution. The matter was fully recited in our petition for partial distribution on file in this Court. Reference is hereby made to the petition. Partial distribution was ordered and the agreement was completed according to the order.

"Practically, the deal cost $28,500 with some interest at the bank and $13,000 to Smainis. The residuary legatee acquired about 667 shares of Continental Oil, since sold for about $13,340; 500 shares of Texas Gulf Sulphur, since sold for $17,100; 1,800 Cord Corporation selling for $5.00 when delivered to the residuary legatee, or soon after delivery; 500 shares Petroleum Corporation, sold for about $6,000; 200 Transcontinental Air Transport, worth $300 to $500. So the residuary legatee benefited about $14,000.

"Actually, the work on this matter consumed more time than any other single detail. The controversy lasted more than a year. I had at least fifty conferences with Smainis, and probably twice that number. With his attorney many. Once more we had vast difficulty raising the money, but induced the United Verde Copper Company to advance a sufficient sum [of] from a treasury distribution soon to be made. The agreement reached with Smainis and his counsel, Mr. Leonard Slosson, did not end the grief. Mr. Smainis delayed affixing his signature to the necessary documents, which had been prepared by his own attorney to preclude his refusal to sign. Once signed up the stocks, or par[t] of them were delivered. I requested E. F. Hutton & Company to transmit the certificates for transfer to Thelma W. Clark. Counsel for E. F. Hutton & Company, brokers, advised the brokers that the settlement was invalid and Hutton & Company refused to transmit the certificates to New York for transfer. I requested the Citizens National Trust & Savings Bank to guarantee signatures and transmit the certificates. They did, and the transfer was made and new certificates were returned in almost record time."

Again, the only evidence which by any stretch of the imagination might be considered adverse to Furman's statement was that which was presented by the testimony which was given by Mrs. Clark. By far the greater part of her testi-

mony was entirely corroborative of the facts set forth in the statement and the later testimony of petitioner. In effect, Mrs. Clark's complaint was that petitioner had been dilatory in effecting a settlement and in consequence thereof that she had employed an outside attorney to get the matter closed. However, on cross-examination she admitted that during the time that the proposed settlement was pending she had been away from California on several different trips and "couldn't know . . . what Mr. Furman was doing in regard to this Smainia claim". She further testified that petitioner told her "That George [Smainia] was holding out for the whole sum, and I wouldn't consider paying the whole claim because I didn't think it was justified. Q. Is that what you or Mr. Furman thought? A. What I thought. Q. Didn't Mr. Furman say that the reason they couldn't settle was because Mr. Smainia was holding out for a figure far in excess of what the estate should be obligated to pay? A. Well, we were agreed on that. Q. At the same time, of course, you weren't willing to pay this exorbitant amount that Mr. Smainia was asking? A. I was not. I thought there should be some way of dealing with him other than just fight back and forth with him trying to beat him down on the amount of his claim. Q. In fact you did beat him down eventually, didn't you? A. Yes. Q. What other thing did you think could be done. A. I didn't have anything definite in mind. That was the reason I went to Mr. Doherty." Furthermore, with reference to the new services that were rendered by Mr. Doherty, who was the extra attorney whom she had employed, Mrs. Clark testified that Furman "sat in on the conferences. After we had employed Mr. Doherty Mr. Furman sat in on every conference that we had. Mr. Doherty was representing me as an individual".

In addition thereto, from the contents of a letter which Mrs. Clark had written to Mr. Regis [who was one of the executors of the will], regarding such services, it appeared that Mrs. Clark had declared that "I fail to see in which manner Hops' (Doherty's) advice was so valuable as we made all the plans and carried them out. He was chiefly an observer." It, therefore, becomes clear that, with reference to the Smainia claim petitioner had made no "false or exaggerated" statement.

The next assignment of "false or exaggerated testimony" that appears in the brief of the board of governors has to do with a matter known as "Pilot Ray". The "testimony" or more accurately speaking, the statement in that regard which was made by Furman in his petition for allowance of fees was as follows:

"In his lifetime W. A. Clark, III, had engaged in the business of manufacturing headlights for automobiles. The device known as the Pilot-Ray, was patented, and so attached that automobile headlights turned with the wheels, but twice as fast as the wheels. It was a highly useful device at night, especially on hilly and curving roads. Large sums were spent on advertising. Full pages in the Saturday Evening Post and other similar publications were used. To finance the enterprise large sums were borrowed; one was a $1,000,000 [$100,-000] loan from the Citizens National Trust & Savings Bank, evidenced by a note. One Ella K. Perin, an aged woman, had an interest in the manufacturing company named the Pilot-Ray Corporation. She joined W. A. Clark, III, in signing the note for the $100,000. Finally the note then amounting to $97,000 was called for payment. W. A. Clark, III, paid and demanded reimbursement of $47,500 from Ella K. Perin, who then lived in Pasadena, California. She moved to Baltimore, Maryland, possibly to escape service of process. W. A. Clark, III, started two suits in Baltimore, both of which resulted adversely without a hearing on the merits. He tried to settle the claim for $10,000 but failed. I advised W. A. Clark, III, that he would lose any suit he started because Ella K. Perin was in my judgment (1) incompetent; (2) she had been misled by a relative, or had failed to know what she had been induced to sign by her relative; (3) if judgment were obtained it would be valueless and unenforceable because the judgment creditor could find no property from which to satisfy the judgment. W. A. Clark, III, told me that Judge Sydney Sanner had given him substantially the same advice. I had a series of conferences with Judge Sanner and we agreed that there was no justification for spending more money on the matter.

"Mrs. Ella K. Perin died and there was a will offered for probate in Baltimore. The will had been executed subsequent to the execution of the note to the Citizens National Trust & Savings Bank. The relative then, alone, could testify to the

circumstances of the execution of the note, and I concluded that he would testify the proceeding had been regular in all particulars.

"Executor Regis and I submitted a plan of attack on the Perin heirs to the residuary legatee (Mrs. Clark). She opposed the plan on the ground that the claim could not be established, and if established the estate of Ella K. Perin could not pay and it would cost her the expenses of the trip. Contrary to her orders I directed Executor Regis to go to Baltimore. It was better for Regis than I to go because he could deny all knowledge of law and could negotiate immediately with the Ella K. Perin heirs. He did all these things and reached an agreement with the Ella K. Perin heirs. Baltimore counsel then put the agreement in legal form. We petitioned this Honorable Court, and settled on order of this Court, for a sum net to the estate of over $20,000 cash. Had we failed to recover, doubtless we would have been called upon to bear the expenses of the trip."

The record shows that Mrs. Clark's connection with the settlement of the "Pilot-Ray" matter was negligible. In effect, she testified that she "didn't have much personally to do with the settlement of that matter"; but that she discussed with Mr. Regis "the advisability of his going to Baltimore. . . . We agreed that it would be a very good move;" and that it was not contrary to her orders "that Mr. Regis went to Baltimore". However, by the testimony that was given through the medium of the deposition of one Huntington Cairns, it appears that in confirmance of Furman's questioned statement in the matter, it was Cairns' firm of attorneys that had charge of the claim in Baltimore, and that it was principally through its efforts that the litigation in the Pilot-Ray matter was compromised. But Cairns admitted that both Furman and Regis had assisted in the settlement. In that regard, Mr. Cairns deposed that:

"The negotiations for settlement after Mr. Clark's death, extended from May 28, 1932, to December 29, 1932, the date on which the settlement which was entered into was finally agreed upon. It included six conferences with Mr. Morgan, culminating finally in the settlement of December 29, 1932. . . . Mr. Regis was present at the conference with Mr Morgan on December 29, 1932, in Baltimore, at which the claims of the respective estates were finally settled. Mr. Regis partici-

pated in the settlement discussion and it was upon his authority that the settlement basis was agreed upon. . . . Mr. Fred J. Furman, attorney for the estate of William Andrews Clark, III, deceased, assisted me in effecting the settlement. . . . Mr. Furman assisted me in the settlement of the estate as follows: After the rejection of the claim of the Clark estate, Mr. Morgan advised me that his defense was based on the California Constitution and California law. He stated that under the law of California each stockholder of a corporation is personally liable for such proportion of the debts contracted while he is such, as the amount of his stock bears to the whole subscribed, and the liability of a stockholder in a corporation formed under the laws of any other state or territory of the United States but doing business in California, is the same. He stated further that this provision of law was repealed November 13, 1930, effective August 14, 1931, but that the repealing provision contained a saving clause. He referred me to the cases of *Thomas* v. *Matthiessen*, 232 U. S. 221 [34 Sup. Ct. 312, 58 L. Ed. 577], and *Fry* v. *Baltimore Hotel Company*, 80 Cal. App. 415 [252 Pac. 752]. I made a study of this contention and it appeared to me that the principle laid down in the case of *Yule* v. *Bishop*, 133 Cal. 574 [62 Pac. 68, 65 Pac. 1094] (1901), constituted a complete answer to Mr. Morgan's contention. On October 10, 1932, I sent Mr. Furman a memorandum on the California law bearing on Mr. Morgan's defense. When Mr. Regis was in Baltimore for the settlement I wired Mr. Furman for his opinion on the validity of Mr. Morgan's defense. I advised him that it was difficult to discuss settlement with Mr. Morgan without an opinion from a California lawyer to the effect that the proposed defense was without merit under the California law. He advised me by telegraph that the case of *Yule* v. *Bishop* was the unquestioned law of California and that there were no adverse decisions. He stated further that the defense had absolutely no foundation in California law. . . . In view of the fact that I received a telegram from Mr. Furman on California law when Mr. Regis was in Baltimore, I think it may be assumed that Mr. Regis and Mr. Furman acted together in effecting the settlement. . . . ''

In the said matter, it therefore becomes evident that in his petition to have his fees determined Furman neither swore falsely, nor did he exaggerate, with reference to the services

that had been rendered by him. To the contrary, with perfect propriety, he might have made a much stronger claim in his own behalf in that regard than that which he actually made. According to the evidence, Regis, although one of the executors of the will, was not an attorney; nor had he had any legal training. "He was a stenographer. He did all the stenographic work in connection with the estate. . . . He was a secretary, a man of business ability," who for years had been in the employ of W. A. Clark, III. As indisputably appears from the record, his ability to render service in the settlement of this particular claim was acquired through weeks of coaching by Furman, who instructed him thoroughly in the various details of law and factual knowledge necessary to be employed in reaching a satisfactory compromise.

Finally, the prosecution attacks Furman's conduct with respect to his statement concerning the sale of certain shares of stock which constituted the principal asset of the estate of W. A. Clark, III. Although the report and the statement of Furman's activities in connection with the disposition of this stock covers more than three legal-size sheets of typewriting, the attack which is made by the prosecution is centered upon the point that whereas Furman asserted that a certain plan which had for its object the sale of the stock was originated by him, as a matter of fact it was initiated either by Mrs. Clark or by one Douglas, who was the president of a corporation which possibly might (but as a matter of fact, did not), become interested in acquiring the stock. However, the undisputed documentary evidence clearly would seem to settle the controversy in favor of Furman's contention in that regard. But it appears that the point is wholly immaterial for the reason that the proposed plan was never adopted nor carried out in any particular. That fact is made very plain by Furman's statement with reference thereto, which occurs in his petition for the allowance of attorney's fees, as follows:

"This transaction marked the passage of the ownership and control of the United Verde Copper Company from the hands of the Clark family. All the evidence points to the fact that my efforts to promote the sale of the stock belonging to this estate set in motion events which resulted in the transfer of title. It is true that the United Verde Copper Co. was not eventually sold to the Newmont Mining Company. It is true

that it was not sold to the United Verde Extension Mining Company. But, it is true that I, first, presented a concrete, logical plan for the sale and disposition of the United Verde Copper Company. The plan was approved in general outlines by the management of the United Verde Extension Mining Company, but at the end of the transaction I was advised that the United Verde Extension Mining Company 'had always been a good neighbor of the United Verde Copper Company and they hoped to continue so'. In other words, I was politely bowed out of the picture on the theory that my aid was no longer essential or necessary. It is a fact that the Newmont Mining Company is the largest stockholder in the Phelps-Dodge Company, and it is . . . reasonable to believe that it was my primary efforts that created a market for the United Verde Copper Company, and I believe that *is* (it) is due to my efforts that we received $55 per share for 4,000 shares and $61 for 6,000 shares, and that if the effort had not been made the entire 10,000 shares would have been sold at a price not to exceed $40.00 per share, . . . ''

With respect to the later actual sale of the stock, it is most evident that although Mrs. Clark made the closing arrangements therefor, practically all the preliminary work in connection with such sale was done by Furman or by Regis, the executor, under the direction of Furman. As is not an uncommon observation with respect to such matters, each of the participants in that sale claimed to be entitled to the major credit for bringing it about. Undoubtedly each of them played a part, but an examination of the evidence with respect to the transaction reveals the fact that the sale was primarily due to Furman's activities and management. His was the guiding hand; and although he may not have been entitled to the entire credit for making the sale, nevertheless since he was generally responsible for its consummation, his statement to that effect cannot properly be regarded as being either ''false or exaggerated''.

It should not be forgotten that a disbarment proceeding is *quasi*-criminal in character; and that although it is not essential that the guilt of the accused be established beyond a reasonable doubt, nevertheless his guilt must be established by ''convincing proof to a reasonable certainty''. (*Bar Assn.* v. *Sullivan,* 185 Cal. 621 [198 Pac. 7]; *Golden* v. *State Bar,*

213 Cal. 237 [2 Pac. (2d) 325].) Such proof does not here appear.

It follows that this court cannot approve the recommendation of disbarment of the accused in the instant matter.

The proceeding is dismissed.

Rehearing denied.