[Civ. No. 17434. First Dist., Div. Two. Jan. 2, 1958.]

DAVID H. JOHNSTONE, Appellant, v. THE CITY OF DALY CITY et al., Respondents.

John J. Fahey, Jr., and Herbert Chamberlin, for Appellant.

Paul M. Hupf and Frank B. Blum, City Attorneys, for Respondents.

KAUFMAN, P. J.—Petitioner, David H. Johnstone, appeals from a judgment of the Superior Court of San Mateo County, denying his petition for a writ of mandamus and his motion for a new trial. By the writ, petitioner seeks to compel the city manager of Daly City to restore him to the position of police inspector. Respondents are the city of Daly City, City Manager Howard J. Stites, the city council and its members (Joseph J. Verducci, Mayor; Edward J. Dennis; Michael E. de Bernardi; Sandford G. Vicker; Del C. Wilson).

The petitioner was discharged by the city council acting through the city manager, for reasons stated as follows: "1. He has not been governed by the ordinary and reasonable

rules of good conduct and behavior and has brought reproach and discredit upon the City of Daly City and the Police Department thereof in that (a) he has investigated a personal friend without asking to be relieved from said investigation; (b) he has associated with persons whom he knew were being investigated by law enforcement groups; (c) he was the cause of official action on the part of the District Attorney of San Mateo County, California, refusing to co-operate with the law enforcement group of Daly City, to wit, the police department.

"2. He did not keep his commanding officer informed of all police matters coming to his knowledge relating to the suppression of crime, including the detection and apprehension of criminals and did not use every effort to discover the principals in a contemplated crime in that he knew of purported gambling in the City of Daly City and did not inform his commanding officer thereof and did not conduct and carry through an investigation on his own."

A public hearing on these charges, before the Daly City Civil Service Board of Review, resulted in a finding that the charges were not true and a recommendation that the petitioner be reinstated with full pay. The city council, after considering the transcript of the proceedings before the board of review, pursuant to its City Ordinance Number 203, elected to confirm the discharge of the petitioner, contrary to the findings of the board of review. Under the provision of Code of Civil Procedure, section 1094.5, appellant applied to the superior court for a writ of mandamus to review the validity of the action of the city council. That court, after considering the transcript of the proceedings before the board of review, found that there was substantial evidence to support the order of the city council and that the city council had the authority to overrule the recommendations of the board of review. The only issues on appeal are whether the respondents acted arbitrarily and denied appellant a fair trial and whether there is any substantial evidence to support the action of respondents.

There is no merit in appellant's first contention that the respondents acted arbitrarily and that he was denied a fair hearing. The relevant portion of the civil service ordinance is as follows: "Written conclusions or findings of the board of review shall be rendered within ten days after the matter is submitted, and thereupon be certified to the City Council or official from whose order the appeal was taken. Such findings and conclusions of the board of review may contain such recommendations as said board shall deem war-

ranted. *The City Council or the appointing officer may thereupon affirm, revoke, or modify the action taken as in the judgment of such Council or officer shall be deemed warranted.* [Emphasis supplied.] The decision and recommendations of the board of review and any action taken by the City Council or appointing officer shall be final and conclusive and shall not be reviewable in any court.'' The record discloses that the appellant was represented by counsel at the hearing, was given the opportunity to cross-examine witnesses and to testify on his own behalf. Thus the cases of *English* v. *City of Long Beach,* 35 Cal.2d 155 [217 P.2d 22, 18 A.L.R.2d 547], *La Prade* v. *Department of Water & Power,* 27 Cal.2d 47 [162 P.2d 13], *Universal Consol. Oil Co.* v. *Byram,* 25 Cal.2d 353 [153 P.2d 746], *Bandini Estate Co.* v. *County of Los Angeles,* 28 Cal.App.2d 224 [82 P.2d 185], *Saks & Co.* v. *City of Beverly Hills,* 107 Cal.App.2d 260 [237 P.2d 32], cited by the appellant, are distinguishable and have no application here.

There is merit, however, in appellant's second contention which is that there was no substantial evidence to support the action of the city council.

The record discloses the circumstances of appellant's dismissal to be the following: The appellant had been employed for some time as police inspector on the vice squad of the Daly City Police Force. An article in Mr. Caen's column in the San Francisco ''Examiner'' in the spring of 1955 alerted the city manager to the possibility of the existence of bookmaking in Daly City. The chief of police was called in, establishments in Daly City checked, among them that of Dino Donati at 6207 Mission Street. No arrests were made as each time the premises appeared to be cleared by the time the investigating officers appeared.

On May 11, the chief of police received the following letter from the district attorney: ''This is to confirm our understanding arrived at in your office on Monday, May 9, 1955, to the effect that Inspector Dave Johnstone will no longer be permitted to investigate bookmaking and gambling cases in Daly City. As I explained to you in your office, I am confident that his position with Dino Donati and other known bookmakers and gamblers is such that the unlawful elements with which we are dealing may not be successfuly eradicated so long as he is allowed to remain in his present assignment.

''Should you desire to discuss this matter with your City Manager and your Mayor, I should be very happy to attend such a meeting. It may be very well the decision to drop this

Inspector from your force. It is my personal belief that this action is certainly warranted, as I expressed to you yesterday. However, the matter of remedying the existing situation is certainly left up to you and your city administration. I merely wish to confirm the statement made yesterday that it would be impossible for me to continue to offer the co-operation of this office so long as Inspector Johnstone remains on his present assignment.

"Sincerely yours,

"Keith C. Sorenson, District Attorney."

On May 12, the mayor, the city manager and the chief of police had a conference, the substance of which was as follows according to the testimony of the mayor: "First of all, we wanted to know from Chief Petrocchi the reason for his willingness to take Dave Johnstone off the vice detail. Chief Petrocchi told us about the investigation or the alleged investigation at the gambling place on Mission Street. He also told us about Johnstone's friendship with Donati. He also volunteered the information at that particular time that Johnstone would be willing to take a suspension and a demotion, but would fight were he to be discharged. Why he volunteered that particular information at that time I don't recall."

At a discussion between the district attorney, the mayor, and the city manager on May 18, the mayor testified as follows: "The district attorney . . . said . . . that the raid was spoiled on the 18th of April because of the fact that Johnstone investigated five or four days or whatever the number of days were after the receipt of the letter from the telephone company. He was quite perturbed by that.

"He was also perturbed about the friendship between Officer Johnstone and Dino Donati. He also told Mr. Stites and myself that he had heard of rumors of gambling in Daly City and felt that Officer Johnstone knew of these rumors and had not investigated or reported them to his superior officers." On Thursday, May 19, the city council discussed the matter and the recommendation of dismissal made by the city manager as follows: ". . . we felt we had three things we could do.

"The first was mere suspension. We felt that would be a slap on the wrist and wouldn't do the thing that we wanted for the City of Daly City.

"The second was demotion and we felt, in essence, that would be the same thing.

"Lastly, of course, dismissal and we felt that was the

only thing we could do. That was the only thing that would do the job for Daly City in ridding the city of that type of activity. We felt that matter was paramount for the city. We didn't like the rumors, be they rumors or be they not rumors, or the allegations made. We felt this was the way to start something that would rid ourselves of this type of thing or anything that was akin to it.

"Q. And as a result of that conversation then, I assume that the disciplinary action chosen was dismissal?

"A. The disciplinary action unanimously chosen and approved by the Council and carried out by the administrative officer was for dismissal. We are a lay body and the method of dismissal was left to the City Manager's discretion."

At the time of its action the city council did not know whether the appellant's superior had knowledge of appellant's friendship with Mr. Donati. On Friday, May 21, 1955, the appellant was called in and asked if he had not checked out the Donati premises on April 18 just prior to the district attorney's raid. The appellant answered "so that's what it's all about." He was then told that he was dismissed. Appellant asked that the action be withheld until Monday so that he would have a chance to see the district attorney.

On the afternoon of May 21, the following conversation took place between the district attorney and the appellant, according to the testimony of the district attorney: "He told me he had gotten a letter some five or six days prior to his getting into the establishment. He said as soon as he received the assignment he had gone directly down to the establishment, which I believe was his pinball distributing shop and the doors were locked. In Mr. Johnstone's own words, 'The door was locked and I couldn't get in and investigate, could I'? He proceeded finally and located Mr. Donati the following Monday in his pool hall across the street and that someone stood in at the pool hall for Mr. Donati while they went across the street to the pin ball distributing shop at 6207 Mission and looked at the establishment.

"I asked Johnstone if he had any contact or communication with Mr. Donati between the time he first received his assignment and the time he actually got in and checked out the establishment and he said, 'I am not sure. I could have,' or 'I don't remember.' Those were approximately his words because it seemed very important to me at the time and I thought he might have a good answer.

"I then asked him about his relationship with Mr. Donati

and he stated that he was a good friend and had been for many years. I asked him about any business relationship and he denied any business relationship with Mr. Donati. He stated that he was guilty of associating with Donati and agreed that was wrong.

"I asked Mr. Johnstone if he really believed that was wrong and he said, 'Well, I didn't think about it at the time, but I guess it was wrong for me'—in his own words—'to investigate' his own good friend Mr. Donati.

"That is just about the substance of the conversation, Mr. Chairman.

"Mr. Chairman, I do have one other recollection of a further matter that was discussed in that matter with Mr. Johnstone. I asked him about a previous suspected illegal activity in the pool hall of Mr. Donati across the street from 6207 Mission in the latter part of December of last year or possibly the earlier part of this year and asked him if he had heard there was any illegal activity going on there and he said 'yes' he heard rumors to that effect. I asked him if he knew that Mr. Donati had been suspected of bookmaking and he said he had heard that but wasn't sure. I asked him if he heard a rumor of suspected illegal activity in the pool hall across the street had he reported it to his superiors and he said 'no.'

"I asked him if he ever did any checking on such things and he said, 'No, I do what I am assigned to do.'" On Monday, May 23, 1955, the appellant came in with his attorney and was dismissed with instructions to be granted all accrued vacation pay.

The district attorney testified that the events leading to his letter were as follows: "Primarily and generally it was written with the interests of good law enforcement in San Mateo County. I have in mind specifically the events leading up to the writing of that letter which began probably around the middle of April when there came to our ears and to the ears of the Daly City Police Department information concerning bookmaking activities being on the increase in Daly City.

"The Chief of Police had asked me to give him any information that I came across concerning any illegal activities in Daly City and I agreed to do that.

"After one unsuccessful raid had been carried out, I believe that was about the 15th or 16th or 14th of April on Mission Street, on the 18th of April I received information

from a confidential informant that there was a bookmaking operation together with an illegal gambling operation involving the use of dice and cards operating at 6207 Mission Street.

"I had my staff members convey that information to the Chief of Police that day and arrangements were made for a checking out of that address on the evening of April 18th.

"I decided to go along with my investigator Mr. A. L. Lamport and upon arriving at Daly City Police Department, Inspector Johnstone was in attendance, being I believe, the highest ranking officer in attendance. I understood that Officer Conci had been detailed by the Police Department to accompany us on the checkout that particular night. We asked for Officer Conci. He was not there but was contacted at home. He and Lieutenant Beecher both arrived on the scene at the same time and we then discussed the information that had earlier been given to Chief Petrocchi about the alleged operation at 6207 Mission. The discussion brought out the fact that the establishment was operated by Dino Donati. We then discussed the physical setup of the building that we were going to attempt to make an immediate entry into.

"Questions were asked of the officers present, if any one of them had any knowledge of the interior of the building and Inspector Johnstone said that he did have. That was his first indication that he knew anything about the operation of any suspected illegal activity at 6207 Mission. He stated that he had been in the building that afternoon about four o'clock and had checked out the phones. That's just about the words that he used. He was asked for what reason had he checked out the phones. He stated that a letter had come to the department from the Pacific Telephone and Telegraph Company calling attention to the possibility of illegal activities in the use of the telephones at that particular address; that he had been given the letter to check out and that he had checked it out and that there was no evidence of illegal operations and left." On the visit to 6207 Mission Street the district attorney found two telephones separated by a partition, which appeared suspicious to him, although he did not have very much experience with bookmaking setups.

In addition to the above, the record contains the following evidence on the individual charges:

(a) and (b) Investigating a personal friend without asking to be relieved from said investigation and associating with

persons whom he knew were being investigated by law enforcement groups. This charge refers to a letter from the telephone company received by the police department, about the use of the telephones at 6207 Mission Street, owned by Mr. Donati. The telephones were in the name of William Aslon who was known to the appellant only as "Bill," one of Mr. Donati's employees. Mr. Donati was a personal friend of the appellant and this fact was known to the Chief of Police at the time the appellant was ordered to investigate the letter from the telephone company. The appellant proceeded to investigate the matter without asking to be relieved. The record further disclosed that most of the city council also knew Mr. Donati rather well; in fact, the mayor had also played golf with him. Mr. Donati was suspected of bookmaking. There was also evidence at the hearing that in February Mr. Donati had offered the tenant of the apartment above his premises $150 for the use of her phone and the apartment which she now rented for $40. The district attorney testified that, although Mr. Donati had on one occasion installed a pin ball machine without a permit and was suspected of bookmaking activities, he did not have enough evidence to charge Mr. Donati with a criminal offense.

(c) Being the cause of the refusal of the district attorney to cooperate with the police department of Daly City. This charge refers to a letter written by the district attorney on May 10, the pertinent parts of which are as quoted above. The district attorney testified that his belief that Mr. Donati was engaged in bookmaking and that the appellant was not cooperating was based on information received from an informant and a rumor in a newspaper column that certain vice raids in Daly City were being unsuccessful because of a tip-off. The other members of the city council testified that their action was chiefly predicated on the district attorney's letter, and that prior to the receipt of this letter, they had always thought very highly of both the appellant and Mr. Donati, both of whom they knew. The district attorney further testified that the appellant had spoiled a contemplated "raid" on Mr. Donati's establishment by the district attorney's office on May 18. However, the chief of police testified that the appellant had not been told of the contemplated raid by the district attorney's office. An assistant of the district attorney who had participated in the visit to 6207 Mission Street on April 18 testified that they were not making a "raid" but only "a preliminary investigation of whether

or not this particular outfit was in operation and whether or not there was any illegal card games or what type of gambling was going on."

2. Not keeping his commanding officer informed of all police matters coming to his knowledge and not conducting an investigation of his own.

The first part of this charge refers to the appellant's alleged knowledge of bookmaking activity in Mr. Donati's establishment in December 1954. On this matter the chief of police testified as follows: "Now to your knowledge, did Inspector Johnstone around December or the first part, rather the last part of the year, December 1954 or January 1955, make any statement to you or report to you any gambling places to be investigated? A. I don't recall that he did. . . .

"Q. As a matter of fact, it is true is it not, Chief, that you yourself were fully aware of these rumors? A. That is correct.

"Q. And it is also a fact, is it not, Chief, that at the time that these rumors were prevalent that you assigned one or two sergeants under your command to investigate the matter? A. That is right.

"Q. And it is true that pursuant to the directive the sergeant did what you ordered? A. That is correct.

"Q. So that in truth and in fact there would be no reason why Inspector Johnstone should report to you anything that you already knew? A. I was aware of the situation." The second part of this charge refers to the five-day delay between appellant's receipt of the order to investigate the letter from the telephone company on May 13 and his final contact with Mr. Donati's employee on May 18. The appellant testified that the premises were locked on May 13, and that in the interim period he could not find Mr. Donati and was busy with other duties. The record also discloses that the appellant recommended that the second telephone be removed.

We do not think that the above is substantial evidence to support the order of the city council. ■ As said in *Cornell v. Reilly,* 127 Cal.App.2d 178 at 183 [273 P.2d 572] : "It may be conceded that in disciplinary administrative proceedings the burden of proof is upon the party asserting the affirmative (*Bley* v. *Board of Dental Examiners,* 87 Cal.App. 193 [261 P. 1036]), and that guilt must be established to a reasonable certainty (*Furman* v. *State Bar,* 12 Cal.2d 212 [83 P.2d 12] ; *Coffman* v. *Board of Architectural Examiners,* 130 Cal.App. 343 [19 P.2d 1002]) and cannot be based on

surmise or conjecture, suspicion or theoretical conclusions, or uncorroborated hearsay.''

It is our view that the record shows that appellant was discharged from his position on charges that were based on suspicion, conjecture and hearsay, and not on substantial evidence necessary to warrant his discharge. Suspicion, conjecture and hearsay, even though strong, are not sufficient under our law to constitute evidence and warrant a discharge from a civil service position. We do not feel the charges against appellant here were proven though in fairness we must state that the district attorney had grounds for his suspicions here.

Judgment reversed with directions to the trial court to issue a writ of mandamus reinstating appellant in his position with accrued salary from the date of his discharge less any moneys or sums received by him from gainful employment since his wrongful discharge.

Dooling, J., and Draper, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied February 26, 1958. Shenk, Acting P. J., and Spence, J., were of the opinion that the petition should be granted.