This is a proceeding instituted in this court for the disbarment of John J. Sullivan, an attorney and counselor, for conduct involving moral turpitude. Defendant was at all the times mentioned in the accusation one of the police judges of the city and county of San Francisco, and all the charges against him are for acts and conduct on his part with relation to matters coming before him as such police judge, our law providing that an attorney and counselor may be removed "for the commission of any act involving moral turpitude, dishonesty or corruption, whether the same be committed in the course of his relations as an attorney or counselor at law, or otherwise." (Code Civ. Proc., subd. 5, sec. 287.) Three separate, specific charges against the accused are made by the accusation. Each charge involves the most serious accusation that can be made against a judicial officer, viz., that of agreeing to receive and receiving money upon the corrupt understanding and agreement that his official conduct shall be thereby influenced. All of the charges were denied by the accused by verified answer filed herein. This court retained jurisdiction of the matter instead of transferring it to a district court of appeal, because of the seriousness of the charges and the official station of the accused. By order of the court, the evidence in support of and against the charges was taken by the chief justice, and the transcript of the evidence *Page 623 
so taken has received the careful consideration of each member of the court.
No serious question of law is presented. It is conceded, of course, that by this accusation the accused was called upon to meet only the specific charges made against him therein, and that we are confined to those specific charges, viz., agreeing to receive and receiving money upon the corrupt understanding alleged, in the matters and proceedings specified in the accusation. No other misconduct is alleged in the accusation or included in the charges filed. On the other hand, it is clear that if it is satisfactorily shown that with regard to any of the proceedings specified in the accusation the accused either agreed to receive or received any money upon any such corrupt understanding as is alleged, the accusation should be held to be sustained and the accused disbarred. Some question is raised as to the degree of proof essential to warrant a conviction, i. e., whether the rule applicable in criminal prosecutions that guilt must be shown beyond all reasonable doubt obtains in such a proceeding as this. So far as appears, this precise question has never been determined by this court. A disbarment proceeding is not a prosecution for crime. In some states, however, it has been held that the charges must be proved beyond a reasonable doubt to warrant disbarment. In discussing a question of the sufficiency of an accusation this court has said: "This accusation is in the nature of a criminal charge, and all intendments are in favor of the accused. The accusation is not sufficient if, all its statements being true, the accused could he innocent. (Matter of Haymond, 121 Cal. 385,388, [53 P. 899, 900].) And again: "A judgment against the respondent will deprive him of personal and property rights. Unless we are clearly satisfied of respondent's guilt we ought not to remove or suspend him from the practice of his profession. As we are not so satisfied, we decline to strike his name from the roll." (Disbarment of Houghton, 67 Cal. 511,517, [8 P. 52].) This, of course, means that something more than the mere preponderance of proof that will suffice in the ordinary civil cause is essential. [1] While we may concede that it may not be necessary, as in strictly criminal prosecutions, that guilt be established beyond all reasonable doubt, we are satisfied that a finding of guilt should be *Page 624 
made only upon such proof as clearly and satisfactorily establishes guilt in the minds of the judges. [2] It seems, furthermore, clear that in such a proceeding all intendments should be in favor of innocence, and that where two or more equally reasonable inferences may be drawn from a fact shown, that inference leading to a conclusion of innocence should be accepted rather than one leading to a conclusion of guilt. (In re Application of Alameda County Bar Assn., 35 Cal.App. 534,536, [170 P. 432].) Especially does this seem true where the charge is of acts constituting a felony involving the grossest of moral turpitude, and a conviction of which in a strictly criminal prosecution not only subjects the offender to imprisonment in the state prison, but also forever disqualifies him from holding any office in this state. (Pen. Code, sec. 98.)
The specific charges contained in the accusation are as follows:
First: That in two felony matters pending before him as a committing magistrate, each against one Bernardino Catterini, charged with assault with a deadly weapon with intent to commit murder, the accused, on or about January 12, 1918, did agree to receive and did receive $150 in money, "as a bribe, from one Peter P. McDonough, upon the corrupt understanding and agreement" between him and said McDonough that he, as such police judge, should thereby be corruptly and unlawfully influenced in his decision of said two cases, and that he was thereby corruptly and unlawfully influenced and dismissed said cases corruptly and unlawfully. This matter will hereinafter be referred to as the Catterini matter.
Second: That on or about September 23, 1918, while one Tony Spinelli was in custody on a charge of assault with intent to commit murder, the accused agreed to receive, and did receive, fifty dollars in money from one C. Vincent Riccardi upon the corrupt understanding and agreement between himself and Riccardi that his action and decision in the matter of the approval of a certain bail bond for five thousand dollars signed by Angelo, Cosenza and Malina Cosenza then presented should thereby be corruptly influenced, and that he should in return for said money approve said bond and order the release of Spinelli from custody; and that he was thereby corruptly influenced to do *Page 625 
so, and did approve said bond and make said order for release. This matter will be hereafter referred to as the Spinelli matter.
Third: That in a misdemeanor prosecution against one Pastiango, who was charged with violating the provisions of an ordinance prohibiting lewd and lascivious acts, the accused, on or about November 28, 1919, agreed to receive, and did receive, forty dollars money as a bribe from said Riccardi, upon the corrupt and unlawful agreement between them that in return for said money he would discharge said Pastiango from custody upon his own recognizance immediately after finding him guilty and sentencing him to ninety days' imprisonment in the county jail, all of which he did. This matter will be hereinafter referred to as the Pastiango matter.
At the outset it should be stated that as to all the charges the only direct evidence of guilt of the accused is that of one C. Vincent Riccardi, who was at all the times referred to in this proceeding a duly admitted attorney and counselor at law. Probably no witness has ever appeared before a judicial tribunal who was shown to be less worthy of credit in the absence of substantial corroboration than this witness. According to his own testimony, he was for many months a voluntary and active participant, for his own private and personal financial gain, in a system of disposing of matters in the police courts of San Francisco by the bribery of judges thereof, and he was the instigator and prime mover in the particular corruption charged against the accused in this proceeding. That his reputation for truth, honesty, and integrity in the community in which he lived is bad is established by many reputable witnesses, and not denied. Moreover, a motive for the giving by him of sensational evidence relating to conditions in the police courts is most clearly apparent. Early in the year 1920 he was convicted of felony embezzlement in the superior court of San Francisco, and on such conviction adjudged to suffer imprisonment in the state prison. His activities in the matter of disclosures relative to police court conditions immediately followed such conviction. His imprisonment on such conviction was postponed by an appeal, and he has been at large on bail. At the time he testified before this court the judgment had not become final. It had been *Page 626 
affirmed by the district court of appeal, but the matter was still pending on application for hearing in this court. In all his activities in the matter of disclosures he has known that in the event of the affirmance of the judgment against him his only chance of escape from imprisonment was the granting of executive clemency. His own testimony on this matter showed very clearly that he fully realized that by giving the character of sensational evidence relative to corruption in the police courts that he was giving before the grand jury, the Bar Association committee, and in this proceeding he might create the feeling that he was rendering so great and impressive a public service as to make a pardon in his own matter a proper recognition and reward. That he had such a hope he freely admitted, as well as that, by reason of his disclosures, he had already received some assurances of friendly interest. Of course, these were given him in view of a belief on the part of those giving them that he was telling only the truth. But it is obvious that he fully realized that no movement for executive clemency in his own behalf could be inspired by a story on his part that was devoid of sensational exposure of official corruption. Hence, we find here the strongest kind of a motive for false accusation against the police judges. We think it is self-evident that no statement of this witness can be accepted as true simply because he testifies to its truth. It may or may not be true, but uncorroborated it cannot produce conviction in an unprejudiced mind.
With these observations we proceed to discuss the evidence relative to the various charges, taking up first the Pastiango matter.
Pastiango was first charged with a felony in having violated section 288 of the Penal Code. The matter was pending before accused as a committing magistrate, and Riccardi was acting as his attorney. The matter was heard on November 13, 1919, Mr. Maundrell, assistant district attorney, appearing for the people and Riccardi for the defendant. But one witness was presented by the prosecution, the girl upon whose body the alleged acts were charged to have been committed. According to her testimony, she was three months and two days short of being fourteen years of age at the time of the commission of the alleged crime. Her testimony being concluded, further hearing was continued *Page 627 
until November 17, 1919. On that day, when the matter came on for further hearing, Mr. Maundrell said: "From the testimony of the complaining witness in this case the prosecution fails as far as section 288 of the Penal Code is concerned. And at this time I will recommend that the defendant be arrested under Ordinance 1059," an ordinance prohibiting any lewd, indecent, or obscene act or conduct, and making a violation of its terms a misdemeanor. The accused then announced that the felony charge would be dismissed, and continued the matter for dismissal to the next day, presumably to give time for the institution of the misdemeanor prosecution. On the next day the dismissal was made by the accused. A prosecution under the ordinance was instituted, and it was in relation to the disposition of this prosecution that the bribe was alleged to have been agreed to be given and accepted. The only direct evidence as to this is that of Riccardi. He is rather vague and indefinite as to the time when the agreement was made, except that he said several times it was before "the dismissal," by which he must mean the dismissal of the felony charge, for this was the only "dismissal" in that matter. In fact, Riccardi testified on direct examination here that the agreement between him and the accused included the dismissal of the felony charge, but subsequent testimony on cross-examination would indicate that his alleged talk with the accused about the matter was during the pendency of the misdemeanor prosecution. This dismissal, we have seen, was recommended by the prosecuting officer for failure of evidence to establish the crime alleged under section 288 of the Penal Code.
Substantially the alleged agreement was that in return for forty dollars to be paid to the accused judge, Pastiango was to be given what was called "a suspended sentence," meaning that although he was to be found guilty and sentenced, execution of that sentence was to be suspended. The misdemeanor case was subsequently submitted to the accused judge upon evidence conceded to be the same as that given upon the felony charge, a transcript of which is in evidence here. The accused found the defendant guilty, sentenced him to ninety days' imprisonment in the county jail, and suspended execution of sentence. Riccardi says that while the case was pending he agreed to give the accused forty dollars in this matter in payment for such *Page 628 
action on his part, and that on the day the matter was disposed of he gave him the money. The accused denies absolutely any arrangement whatever with Riccardi in the matter and denies that he was paid any money by Riccardi.
The only pretense of corroboration of Riccardi's evidence which is here claimed is the action of the accused in the Pastiango case in view of the evidence given therein, and his statements on cross-examination here as to his reasons for suspending execution of the judgment. Of course, it is not claimed that mistakes in acts and decisions of a judge that may reasonably be attributed simply to bad judgment or even gross carelessness in the discharge of official duty constitute evidence of bribery of the judge. And yet at best we have no more here in regard to the disposition of the Pastiango matters. The dismissal of the felony charge was asked by the prosecuting attorney, as to whom there is no insinuation of misconduct. There was room for an honest difference of opinion as to whether the special offense defined by section 288 of the Penal Code was sufficiently shown by the only evidence produced, presumably the only evidence obtainable, to warrant holding the defendant for trial thereon in the superior court, and the situation was such that not even a suspicion of corrupt influence arises from the mere act of the accused in acceding to the request of the prosecuting attorney.
As to the suspension of execution of the judgment in the misdemeanor matter, the law of this state authorizes such action, and we know that it is a course very frequently, perhaps too frequently, followed. Whether or not in any particular case the circumstances are such as to warrant such a disposition is peculiarly one for the trial judge. Personally, we should feel that if Pastiango was guilty of soliciting this girl by word or act to engage in lewd, indecent, or obscene conduct with him, the case was not one for suspension of execution of the judgment. But we cannot say from the evidence before us that the accused did not in good faith consider it a proper case for such action. Some of his reasons for his action in this case given in justification when being pressed by able counsel on cross-examination in this court certainly do not appeal to us as being good reasons. It is, however, only fair to the accused to say that among his reasons given for suspending *Page 629 
execution of the judgment was that in view of the testimony of the girl, and the manner of her testifying and the circumstances of the case generally, he was not satisfied of the guilt of the defendant, and further, that neither the prosecuting officer nor the arresting officer objected to the course followed. We cannot find in either his conduct in the case or in his testimony any corroboration of Riccardi's evidence with relation to a bribe. As we look at the matter, in so far as agreeing to accept or accepting a bribe is concerned, it is simply Riccardi's word against that of the accused, with the result that we are not satisfied of the guilt of accused of the offense charged.
As to the Spinelli matter: Spinelli had, been arrested on a charge of assault with intent to commit murder. The matter had been assigned to Police Judge Brady's department, and application was made by Riccardi to the accused at his residence during the evening of September 23, 1918, to approve a five thousand dollar bond offered for the release of Spinelli. Riccardi testified that during the day he had arranged with accused to meet him at his home that evening, both to fix the bail at five thousand dollars and to approve the bond offered, and that he was to pay him fifty dollars for so doing. The accused testified that he had heard nothing about the case until Riccardi with others called at his house that evening and requested approval of the bond. He further testified that according to his recollection Judge Brady had fixed the bail at five thousand dollars. There is no evidence other than Riccardi's as to the fixing of the bail by accused, or as to any previous arrangement with accused for the approval of the bond. It is a common occurrence for police judges to approve bail bonds out of office hours at their homes. Riccardi, who had the bond prepared at his office, even to the signatures of the sureties, went with the sureties to the home of the accused and proffered the bond to the accused with a request for its approval. It was approved by accused, who affixed his signature either then or the next day to the jurat on the affidavit of each surety, and also to the certificate of acknowledgment and approval, signed an order for release, which he gave to Riccardi, and retained the bond. Riccardi testified that in pursuance of his agreement he then gave the accused fifty dollars, and the accused testified that there was no arrangement *Page 630 
for any payment and that no money was paid. As to this it is simply Riccardi's word against that of the accused. The only alleged corroboration of Riccardi's testimony is in the circumstances attendant on the approval of the bond. Riccardi testified that the accused did not examine or swear the sureties, and one of the sureties, Angelo Cosenza, whose knowledge of the English language was so defective that he was compelled to testify through an interpreter, testified that the accused said nothing to him and talked only to Riccardi. The accused testified that he must have sworn the sureties, as this was his universal custom. We are not prepared to hold that he did not purport to do this in the informal way that unfortunately is adopted very often by careless officials, so informal, in fact, in some cases as to fail to bring to the knowledge of the witness the fact that an oath is being administered. It is admitted by the accused, however, that he did not examine the sureties as to their sufficiency, confining his questioning to Riccardi and relying wholly upon Riccardi's assurances as to their sufficiency and qualification. He apparently believed that he was fully justified in so doing. In thus doing he was guilty, of course, of gross neglect of duty. Nor could he have carefully examined the bond, for a reading of the affidavits of the sureties, who were husband and wife, disclosed that the property described in the affidavit of each as "his property" that "stands of record in his name" and stated to be of the value of nine thousand dollars, was the same identical property, a lot in San Jose. Cosenza testified here that this property was worth only two thousand dollars, and an examination by the accused of the sureties would doubtless have disclosed that fact. But this is not a proceeding against accused based upon a charge of neglect of official duty. The question is whether, in view of Riccardi's testimony, it sufficiently warrants an inference of the alleged bribery. We are perfectly satisfied that it does not. It may much more reasonably be attributed to a careless method of transacting official business, in acting solely upon the assurance of another in lieu of the personal investigation that a proper conception of official duty and responsibility requires. To our minds it affords no evidence whatever of the specific charge of bribery, with the result that as *Page 631 
to the bribery charge we have nothing but Riccardi's word, and are not satisfied of the guilt of the accused thereof.
As to the Catterini matter: The charge here is that accused agreed to receive, and did receive, $150 from one Peter P. McDonough, upon the corrupt agreement between them (McDonough and accused) that his conduct in such matter should be influenced thereby. Riccardi was the attorney for Catterini. His dealings in the matter of the alleged corrupt arrangement were with McDonough alone, his testimony being to the effect that, there being one thousand five hundred dollars obtainable from Catterini, he arranged with McDonough that the latter should have the bail fixed at one thousand dollars cash, and the case subsequently dismissed, and that the one thousand five hundred dollars should be divided, five hundred dollars to McDonough, five hundred dollars to the accused, and five hundred dollars for himself. McDonough testified that there was no arrangement relative to the case between himself and Riccardi, except that in the course of his business as a bailbond broker he, at the request of Riccardi, and for the usual commission of ten per cent, furnished the bail money. He further testified that he never spoke to the accused about the case and never paid him any money on account thereof. The accused testified that McDonough never spoke to or communicated with him about the case and never paid him any money on account thereof. According to his own testimony, Riccardi's only talk with the accused about the matter was some time after the dismissal, when he asked him how much McDonough gave him in the Catterini matter and the accused, on being told by Riccardi that he was to receive five hundred dollars, said that McDonough gave him only $150. The accused denied that any such conversation occurred.
Catterini was arrested the evening of January 1, 1918, voluntarily surrendering himself into the custody of an officer on learning that he was being looked for, on two charges of assault with intent to commit murder, alleged to have been committed between 12 and 1 A. M. of the same day.
On January 2, 1918, bail was fixed by accused on the two charges at a total of two thousand dollars, or one thousand dollars cash, and the cash being deposited, Catterini was *Page 632 
released from custody at 11:55 A. M. According to Riccardi's uncorroborated word he had asked the accused to fix the bail and accused had declined to do so at the moment, in view, as he stated, of the seriousness of the charge, and Riccardi had then gone to McDonough and solicited his assistance, with the result that the bail was fixed. The order fixing bail was filled in, except for the amount, in the handwriting of the clerk of the court, a Mr. Hagan, who testified that he had never made out an order fixing bail unless the court was in session. The amount and signature of the judge are in red ink, and the accused testified that he knew the signing was done in court for the reason that all signatures while on the bench were made in red ink, and all while off the bench in black ink. He further testified that he fixed the bail at Riccardi's request. There is absolutely nothing to show any communication, direct or indirect, from McDonough to accused prior to the making of such order, except in so far as one may speculate in view of the intimate relations existing between accused and McDonough, and the amount of bail fixed. To hold that there was such communication would be to indulge in the purest of guesswork. Certainly we may not in a judicial proceeding fairly infer therefrom any arrangement between them for a bribe. It is as reasonable to infer in view of the circumstances we have stated that the bail was fixed in court solely at Riccardi's request, as testified to by the accused, as it is to infer that this action was had because of some possible communication from McDonough.
Riccardi's testimony as to the amount of money paid by Catterini is flatly contradicted by that of Catterini, who impressed the court as honestly endeavoring to tell the truth. He said that he paid $225 in cash and Liberty bonds, and eight hundred dollars on a note that he signed on January 12, 1918, being $1,025 in all. He also contradicted Riccardi as to ever having been taken to McDonough's place of business, testifying that he never saw McDonough until long after the dismissal of the charges against him. There is some corroboration of Riccardi's testimony as to having some sort of arrangement with McDonough to be found in the fact that the eight hundred dollar note signed by Catterini was payable to Mrs. Riccardi (the mother of Riccardi) and McDonough jointly, although McDonough testified that his *Page 633 
connection with the matter was solely for the purpose of accommodating Riccardi in obtaining cash for his fee, and that he received eighty dollars for his indorsement of the note and the giving of his name as security. This was in addition to the one hundred dollars which he received for furnishing the one thousand dollars cash bail on which Catterini was released. But whatever the arrangement between Riccardi and McDonough, no conclusion adverse to the accused can be based thereon in the absence of evidence connecting him with the matter.
Catterini having been released on bail, the hearing on the charges was continued from time to time, testimony being taken on several of the days on which the matter came on for hearing, until finally, in April, 1918, the charges were dismissed by the accused. At these various hearings the people were represented by an assistant district attorney, Mr. Maundrell. The case was fully heard, and nothing out of the ordinary course of procedure appears in the transcript of the proceedings. Some point is made of the fact that the accused, with the attorneys, went to the hospital to take the evidence of the woman who, it was alleged, was shot by Catterini. To our minds there is absolutely nothing, except the testimony of Riccardi, to indicate that this was done at the instance of McDonough, or otherwise than in regular course. When the taking of testimony was fully concluded, the matter was submitted to the accused: for decision. The transcript of the proceedings is before us, and it shows that at that time the following occurred:
"Mr. Riccardi: We have not any further evidence, your Honor.
"Mr. Maundrell (Assistant District Attorney): The case of the people is in in this matter.
"The Court: How do you feel about it yourself, Mr. District Attorney?
"Mr. Maundrell: There is a question in my mind that there might be a probable cause for a holding. I will submit the matter to the court.
"The Court: There is a question in my mind, and it is reinforced by the fact that the defendant surrendered himself. That isn't ordinarily the act of a guilty man, nor is it indicative of a consciousness of guilt. The identification by the complaining witness, or the injured person, is entirely *Page 634 
unsatisfactory, and the identification of a neck-tie and pin and a pair of shoes. It seems that a person who was present committing an act of that character would have rendered some other mark of identification which could have been made more complete and satisfactory.
"Mr. Maundrell: I understand there is a ten thousand dollar damage suit upon file against the man three weeks ago.
"Mr. Riccardi: He has property. He will pay if he loses. That is what they wanted in the first place.
"The Court: Dismissed."
It appears from the foregoing that the assistant district attorney was doubtful as to the advisability of holding the defendant for trial in the superior court, and certainly did not urge or request a holding. It appears from his evidence given in this proceeding that he, as prosecuting officer, talked with the accused in his chambers that morning before the case was dismissed as to what should be done with it, and a fair reading of his evidence here indicates that it was his recollection that he then expressed to the accused his doubts as to the propriety of a holding for trial. The question in the cases was as to the identity of the man who in fact made the assaults, the defendant denying that he was that man. There was positive identification by the woman assaulted and her little daughter, the other person assaulted, but this was somewhat weakened by matters educed on cross-examination, and there were also one or two other circumstances pointing to defendant as the guilty party. On the other hand, there was an apparent absence of motive on the part of defendant, good evidence as to his reputation for honesty, integrity, industry, peace, and quiet, his absolute denial of the charge, and some evidence in support of his claim that he was elsewhere when the assault was committed. It also appeared that a civil action for damages on account of this assault had been instituted against him and was then pending. From the cold record of the evidence given on the preliminary examination it would seem to us that a committing magistrate might well have concluded that there was probable cause for holding defendant for trial before a jury. But the record of proceedings before accused is not such as to satisfy us that the accused did not in good faith think otherwise. It seems that the assistant district attorney who *Page 635 
conducted the case, and who consulted during the course of the proceeding with a private attorney interested in the prosecution who attended the proceedings, thought otherwise, and the police court transcript in the case is not such as to warrant the inference of improper influence upon the accused in the matter, and much less the conclusion that his action was due to an agreement for a bribe.
But one other alleged item of corroboration remains to be noticed. The evidence does disclose an unfortunate and deplorable intimacy between accused and McDonough, one certainly calculated to bring the accused and his court into disrepute. The two had been friends for many years, the friendship dating from a time long prior to the accession of the accused to the police bench. McDonough has been for many years engaged in the business of furnishing cash bail for persons charged with public offenses, especially in the police courts, and his volume of business in the police courts was very large. By reason of the character of his business he was necessarily much interested in the fixing of bail for defendants, and also likely to be interested on occasions in the final disposition of their cases. The friendship of earlier years continued after accused became police judge, something as to which, of course, no one can justly complain, but it was accompanied by an intimacy which, in view of the nature of the business of McDonough and its association with the matters with which the accused was called upon as a judicial officer to deal, was almost bound to create suspicion of improper influence. Indeed, the intimacy was of such a character that, according to the evidence of both McDonough and accused, McDonough had occasionally presumed to speak to accused about some "misdemeanor" case pending before him, never a "felony" case, they said, but occasionally some small misdemeanor case, involving some friend, such, for instance, as an alleged violation of the law regulating traffic on public highways. In so far as the matter of gross impropriety is concerned, we must confess we can see no distinction between such conversations with relation to misdemeanor cases and conversations with relation to felony cases, and we doubt if the line between the two classes would be sacredly observed by a judge and another person whose relations were such that they discussed any matter at all pending before the judge. The confessed showing in *Page 636 
regard to this is such that we may feel that in the Catterini matter, or, indeed, in any other matter coming before the accused that might be under inquiry, McDonough may have spoken to the accused with a view to influencing his action. There is nothing in the record, however, upon which to found such an inference with reference specifically to the Catterini matter except the possible interest of McDonough therein in view of the testimony of Riccardi and the testimony concerning the note given to Mrs. Riccardi and McDonough. In any event, with nothing tangible in the conduct of accused with relation to the case to indicate the presence or effect of improper influence, we are not warranted in inferring anything in the nature of an agreement on his part to accept a bribe or the acceptance by him of a bribe in that matter, or even that he was in any way improperly influenced therein. In so far as he is concerned, the only evidence to connect him with any misconduct in that matter is the absolutely uncorroborated evidence of Riccardi as to an admission by him that he received $150. That uncorroborated evidence absolutely fails to produce even the slightest measure of conviction in our minds. The specific charge against accused with relation to the Catterini matter must be held to be not proved.
[3] None of the specific charges against accused having been sustained by evidence sufficient to satisfy us of its truth, it follows that the order to show cause must be discharged and the proceeding dismissed, and it is so ordered.
Shaw, J., Lennon, J., and Wilbur, J., concurred.