[L. A. No. 23991.   In Bank.   July 10, 1957.]

WILLIAM H. BRAWNER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Glenn A. Lane for Petitioner.

Ellis D. Reiter and Garrett H. Elmore for Respondent.

THE COURT.—It was charged that petitioner received a check for $71,862 from the complainant, Mrs. Jones, with instructions to purchase stock and that he delivered securities to her in the amount of $28,013.80 and paid her $10,000, but that he failed to account for the balance of $33,848.20 and appropriated it to his own use. The local administrative committee found that he had not misappropriated any money and stated that the funds retained by petitioner were to be applied as fees for services which he had performed for Mr. and Mrs. Jones. Upon the same evidence the Board of Governors reached a contrary conclusion and recommended that petitioner be suspended from the practice of law for three years.

Mr. Jones, the husband of complainant, was a very wealthy man, and on his death his estate, exclusive of property held in joint tenancy, was appraised at over two million dollars. Petitioner had been acquainted with Mr. Jones since 1910, and they had engaged in business together for a number of years. Mr. Jones became afflicted with Parkinson's disease in 1946, and thereafter he lived in California, although his legal residence was in Nevada. Commencing in 1946 Mr. Jones called at petitioner's office an average of twice a week for consultation regarding his legal, matrimonial and financial affairs. Mr. Jones' affliction became progressively worse, and late in 1947 at Mr. Jones' request petitioner arranged to have him admitted to a sanitarium in California, where he remained most of the time until his death on July 14, 1949. During this period Mr. Jones asked petitioner to call on him regularly so that he could consult with petitioner about his affairs, and petitioner continued to see Mr. Jones at least twice a week.

Early in 1948 a Reno bank where Mr. Jones had a "private account" of $325,000 refused to honor one of his checks be-

cause the signature was not legible. After a consultation with bank representatives, in which petitioner participated, it was arranged to change the account, which was Mr. Jones' separate property, into a joint account in the names of Mr. and Mrs. Jones. This was done to permit the payment of his obligations and to facilitate the handling of his affairs.

After the joint account was established, Mr. Jones told petitioner that he would give him some money with which to purchase stock and that he might want petitioner to use some of the money to take care of certain personal affairs which he did not want petitioner to mention to Mrs. Jones. In July 1948 Mrs. Jones mailed to petitioner a check for $71,862, drawn by her on the joint account in the Reno bank. Petitioner testified that in his presence Mr. Jones instructed Mrs. Jones to send the check to petitioner, stating that the money was to be used for purchasing stock. She denied that she was present at such a conversation and stated that she sent the check on her own initiative and that she instructed petitioner to use the money to buy stock. Between July 13 and December 16, 1948, petitioner purchased securities at different times, for which he paid $28,013.80. The stock was never placed in petitioner's name, and it was held by a stockbroker in a special account until it was delivered by petitioner to Mrs. Jones pursuant to instructions given by Mr. Jones shortly before his death.

In response to an inquiry from Mrs. Jones as to how much he was going to charge for legal fees, petitioner mailed her a statement dated July 6, 1948, in the amount of $10 for services to date and marked the statement paid in full. In the accompanying letter petitioner said that in view of "our past associations" he was glad to have been of service to them and in the event he could "undertake any real work" he "would be glad to discuss a further fee in connection therewith." According to petitioner, when Mr. Jones heard of the statement for $10, he told petitioner in the presence of Mrs. Jones that he would not accept petitioner's offer to make only a nominal charge for the work he had done, that he wanted petitioner to be paid for his services and that he would take care of him. Petitioner said that Mr. Jones had talked about making provision for him in his will and had suggested giving petitioner one-sixteenth of 50 per cent of his estate. He told Mr. Jones that he did not want him to make such a provision in his will. In a conversation when Mrs. Jones was not present, petitioner said that Mr. Jones

told him that he was not to use all of the $71,862 for the purchase of stock, that petitioner was to hold some of the money to take care of Mr. Jones' affairs and that he was to retain $35,000 for his services. Petitioner testified that in another conversation, which apparently occurred later, Mr. Jones told petitioner in the presence of Mrs. Jones that he did not want petitioner to buy any more stock, that petitioner was to retain $35,000 of the $71,862 as a fee for his services and that the balance was to be held for emergency uses. Mrs. Jones denied that she was present when such a conversation took place or that she was advised of the allocation of funds.

Petitioner testified that a short time after Mr. Jones' death, Mrs. Jones told him that she needed all the cash she could get to pay taxes and that if he would give her the difference between the $71,862 check and the sum paid for the stock, she would pay him the $35,000 fee which had been allotted to him for his services. In compliance with this request, petitioner sent a letter to Mrs. Jones which stated that he held a balance of $43,848.20 subject to her disposition. According to petitioner, Mrs. Jones later changed her mind about handling the transaction in the manner suggested by her. She told petitioner that she thought he had been overpaid for the services he had rendered Mr. Jones and that he should be willing to give her $10,000 instead of $8,848.20, the balance remaining from the $71,862 check. Petitioner then sent Mrs. Jones a cashier's check for $10,000, with a letter dated August 5, 1949, which stated that the check should help relieve any cash shortage. Mrs. Jones denied that she had any understanding with petitioner such as was testified to by him and stated that the $10,000 check was sent to her by petitioner only after she had tried to collect from him the sum of $43,848.20, which she claimed was owed to her.

Shortly after the death of her husband, Mrs. Jones asked petitioner to assist in the probate of the will in Nevada. At her request, petitioner assisted in arranging for the employment of a Nevada attorney to probate the will for an agreed fee of $22,500. According to petitioner, she said that if she was successful in getting distribution under the will* she

---

*A prior will left Mrs. Jones about half the estate. The will offered for probate, which was drafted by petitioner, left all of the estate to Mrs. Jones, and she was concerned about the possibility of a contest. According to petitioner, the later will was executed after numerous consultations by Mr. Jones with petitioner, and at one time Mr. Jones discussed leaving his wife only a small monthly income. Mr. Jones had difficulty in executing the will, and Mrs. Jones took his hand and physically assisted him to sign his name.

would pay petitioner a sum equal to the percentage of the estate which Mr. Jones had at one time planned to leave him. Petitioner said that he would prefer to be paid the same fee as that charged by the Nevada attorney. He refused an offer of a forwarding fee of $5,000 from the Nevada attorney, and he testified that he told Mrs. Jones that he would look to her for his fees.

Petitioner testified that Mrs. Jones did not claim that he had any money of hers until October 1952, over three years after Mr. Jones' death. At that time she wrote petitioner a letter in which she stated that he owed her $33,848.20 and that she was willing for him to deduct $10,000 for his services in representing her, which she said was double the amount the Nevada attorney thought was sufficient compensation for the work petitioner had done in connection with probating the estate. Petitioner was never paid anything for such services.

The local administrative committee found and concluded that petitioner was not guilty of acts of moral turpitude or of violation of sections 6067 and 6068 of the Business and Professions Code relating to the duties of an attorney, that the funds retained by him were to be used for fees for services rendered by him, and that the proof did not establish that he had misappropriated money without legal basis. The committee was of the view, however, that he should have given Mrs. Jones an appropriate writing setting forth the character and value of his services, and it recommended a private reprimand. The Board of Governors, without taking additional evidence, concluded that petitioner wrongfully refused to pay Mrs. Jones the sum of $33,848.20, that the money was not paid to him as a fee and that he wilfully converted it to his own use.

It is settled that charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty and that any reasonable doubts should be resolved in favor of the accused. (*Browne* v. *State Bar,* 45 Cal.2d 165, 168, 169 [287 P.2d 745]; *Hildebrand* v. *State Bar,* 18 Cal.2d 816, 834 [117 P.2d 860]; *Furman* v. *State Bar,* 12 Cal.2d 212, 229 [83 P.2d 12]; see *Lindenbaum* v. *State Bar,* 26 Cal.2d 565, 573 [160 P.2d 9].)

Since it is difficult to pass upon the weight to be given the testimony of a witness when only the written record is before a reviewing body, it is proper to give great weight to the action of the local administrative committee which heard the witnesses and which was in a better position than the

Board of Bar Governors or this court to pass upon the truthfulness of the testimony. (*Browne* v. *State Bar, supra,* 45 Cal.2d at p. 170; *Werner* v. *State Bar,* 13 Cal.2d 666, 676-677 [91 P.2d 881].)

Petitioner is about 70 years of age, and at the time these charges were filed against him he had been practicing for more than 25 years. There is no claim that he had previously been charged with misconduct or that he is. other than a respected attorney with an excellent reputation. Under his version of the transactions, which was accepted by the local committee, he was authorized to retain the sum of $35,000 for his fee, and there was no misappropriation of funds. It would seem clear from the record that this was not an unreasonable fee for the services rendered Mr. Jones over a period of several years. As we have seen, petitioner received $33,848.20 instead of the agreed fee of $35,000 for the work he did for Mr. Jones, and he was never paid anything for the services he rendered Mrs. Jones in connection with the probate of the estate.

We are of the opinion that the local committee correctly determined that the burden of proving a misapplication of funds was not sustained and that the charges were not supported by convincing proof and to a reasonable certainty.

The proceeding is dismissed.