[L. A. No. 28859.   In Bank.   July 1, 1966.]

JOHN  J.  ZITNY,  Petitioner,  v.  THE  STATE  BAR  OF
CALIFORNIA,  Respondent.

Sam E. Collins for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—In this proceeding petitioner seeks a review of the recommendation of the Board of Governors of the State Bar that he be disbarred.

In October 1961, petitioner and one Job Denni, a councilman in the City of Cypress, were indicted on charges of conspiring to solicit bribes, soliciting bribes, and receiving bribes. The criminal acts were alleged to have occurred during three separate transactions. After a jury trial, petitioner and Denni were acquitted on all counts.

Subsequently on February 15, 1963, a local administrative committee of the State Bar charged that petitioner had solicited bribes to obtain zoning changes for certain parcels of real property and had thereby violated his oath and duties as an attorney and committed acts involving moral turpitude and dishonesty. (Bus. & Prof. Code, §§ 6067, 6068, subds. (a), (c), (d), and 6106.) These charges encompassed the same three transactions that had been at issue during the criminal case and were set forth in three counts. In a fourth count the committee charged that during one of the foregoing transactions, petitioner violated rule 9 of the Rules of Professional Conduct of the State Bar of California by commingling his client's money with his own and failing to deposit his client's funds in a separate trust account. After hearings at which most of the witnesses at the criminal trial testified and the record of that trial was introduced into evidence, the committee found petitioner guilty on two counts of soliciting bribes and on one count of failing to deposit a client's funds in a separate trust account and drawing on these funds to meet his personal expenses. It recommended that petitioner be disbarred. On September 18, 1965, the Board of Governors of the State Bar by a vote of 13 to 2 made findings of fact approving the local committee's determination of guilt on three counts and its recommendation that petitioner be disbarred.

Petitioner contends that the evidence is insufficient to sustain the findings of the board. ▮▮ Findings of fact made by local administrative committees and the Board of Governors are not binding on this court, and we will weigh the evidence upon which the findings rest. (*Schullman* v. *State Bar*, 59 Cal.2d 590, 599 [30 Cal.Rptr. 834, 381 P.2d 658];

790

*Sturr* v. *State Bar,* 52 Cal.2d 125, 127 [338 P.2d 897].)

The burden is on the petitioner, however, to demonstrate that the findings are not supported by the evidence or that the recommendations are erroneous or unlawful. (*Best* v. *State Bar,* 57 Cal.2d 633, 635 [21 Cal.Rptr. 589, 371 P.2d 325]; *Rock* v. *State Bar,* 55 Cal.2d 724, 726 [12 Cal.Rptr. 857, 361 P.2d 585].) In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not "sustained by convincing proof and to a reasonable certainty." (*Brawner* v. *State Bar,* 48 Cal.2d 814, 818 [313 P.2d 1].)

In making our determination we resolve all reasonable doubts in favor of the accused. If two or more equally reasonable inferences may be drawn from a proved fact, the inference leading to a conclusion of innocence rather than the one leading to a conclusion of guilt will be accepted. (*Bar Assn. of San Francisco* v. *Sullivan,* 185 Cal. 621, 623-624 [198 P. 7].)

When the findings and recommendations rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. (*Werner* v. *State Bar,* 13 Cal.2d 666, 676-677 [91 P.2d 881]; *Mauer* v. *State Bar,* 219 Cal. 271, 276 [26 P.2d 14].) Necessarily, however, less reliance is placed on this rule when, as in the present case, a jury heard much the same evidence that the local administrative committee heard and acquitted petitioner of virtually the same charges involved in the disciplinary proceedings.[1]

Although petitioner was charged with three counts of soliciting bribes and one count of violating rule 9, one of the bribery counts was dismissed. The State Bar also now concedes that the rule 9 violation should be limited to petitioner's failure to deposit his client's funds in a separate trust account. We shall consider the rule 9 charge first.

On April 19, 1961, petitioner told Theodore Bentley, a real estate developer and builder, that for $12,500 Con-Tech Building Company, a corporation in which Bentley held a one-third

[1]The acquittal of an attorney in a criminal trial does not bar the institution against him of disbarment proceedings even if the issues in both proceedings are identical. (*Best* v. *State Bar,* 57 Cal.2d 633, 637 [21 Cal Rptr. 589, 371 P.2d 325]; see *In re Pennica,* 36 N.J. 401, 418-419 [177 A.2d 721, 730].) The reasons for not applying a rule of res judicata are that the parties are different, the quantum of proof required is different, and "the purposes of the two proceedings are vastly different. A criminal proceeding has for its purpose the punishment of the accused if he is found guilty. A disciplinary proceeding against an attorney is

interest, could obtain a variance so that it might develop its property in Cypress City for residential purposes. Petitioner said that $500 would be a nonrecoverable retainer but that the $12,000 would be returned if the use variance was not approved. About April 27 Con-Tech decided to accept this offer and Bentley brought $12,000 in small bills to petitioner's office. The money was placed in a manilla envelope that Bentley then marked with a ''T'' and sealed with scotch tape. Bentley testified that no receipt was given. Petitioner testified that he did not give a receipt from an office receipt book, but drew a receipt on office stationery so that he could word it to describe accurately the transaction that had been agreed upon. No duplicate was kept by the office and no other notation concerning receipt of the funds was made on any other file in petitioner's office.

Petitioner left the money in his desk for approximately 10 days. On May 8 he placed it in the firm's safe deposit box and, according to petitioner, wrote ''Ted Bentley (Con-Tech)'' on the envelope. On May 29 the City Council of Cypress reversed a May 4 decision of the city planning commission and by a three to two vote granted the use variance subject to three conditions. On June 1 petitioner removed $400 from the previously sealed envelope and then transferred the balance of the $12,000 to a newly-acquired personal safe deposit box. He testified that on June 1 he told his wife that the money belonged to Con-Tech and clipped a note to the same effect to the envelope. During the next several months petitioner made several withdrawals from and deposits to this $12,000 fund. When he was arrested on October 10 only $3,880 remained in his safe deposit box but $7,960 was·in his desk drawer. The first time that either of petitioner's partners was told of this $12,000 fee was on the day before petitioner's arrest.

Bentley testified that petitioner had earned his fee when the variance was granted, and the State Bar does not now contend that petitioner misappropriated his client's funds or commingled them with his own. It is undisputed, however, that before the variance was granted petitioner failed to sequester Con-Tech's funds as rule 9 requires. Section 6077 of the Business and Professions Code provides that an attorney may be

not intended for his punishment, but is for the protection of the public, the courts, and the legal profession.'' (*Best* v. *State Bar*, 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325]; see *Yapp* v. *State Bar*, 62 Cal.2d 809, 817 [44 Cal.Rptr. 593, 402 P.2d 361]; *Ex parte Wall*, 107 U.S. 265, 287 [2 S.Ct. 569, 27 L.Ed. 552].)

disciplined only for a wilful breach of the Rules of Professional Conduct. ■ To establish a wilful breach, it must be demonstrated that the person charged acted or omitted to act purposely, that is, that he knew what he was doing or not doing and that he intended either to commit the act or to abstain from committing it. (See *Palmquist* v. *State Bar*, 43 Cal.2d 428, 435-436 [274 P.2d 640]; cf. *In re Trombley*, 31 Cal.2d 801, 807-808 [193 P.2d 734]; *Towle* v. *Matheus*, 130 Cal. 574, 577 [62 P. 1064].) The wilfulness or intent may be proved by direct or by circumstantial evidence. (Cf. *Kopasz* v. *Kopasz*, 107 Cal.App.2d 308, 310 [237 P.2d 284]; *People* v. *Hall*, 27 Cal.App.2d 440, 444-445 [81 P.2d 248]; Witkin, Cal. Evidence (1958) § 156.)

■ Although the charge and the findings of the local administrative committee and the Board of Governors are defective in failing to specify that petitioner's breach was wilful, prejudice is not presumed from such a procedural error. (See *McGrath* v. *State Bar*, 21 Cal.2d 737, 740 [135 P.2d 1].)

■ A review of the evidence shows that petitioner's breach was wilful and that the defect in pleadings and findings was not prejudicial. Petitioner's firm maintained a clients' trust account in a local bank at the time of the transaction. Petitioner not only failed to deposit Con-Tech's money in the account but he did not use an office receipt or make any other notation in firm files to the effect that a potential fee had been collected. He did not even append a note to the envelope explaining that his firm held the enclosed money in trust for the Con-Tech corporation or inform his partners that a fee had been collected. Not until the day before his arrest, more than five months after he first received the money, did petitioner inform either of the other members of the firm about the fee. The evidence establishes that petitioner wilfully omitted to place the $12,000 contingent fee in a separate clients' trust account and that he had no bona fide and reasonable belief that facts existed that justified such omission. (Cf. *Palmquist* v. *State Bar*, 43 Cal.2d 428, 436 [247 P.2d 640]. See also *People* v. *Vogel*, 46 Cal.2d 798, 801 [299 P.2d 850].)

■ Petitioner contends, however, that the purpose of the sequestration provision of rule 9 is to protect the funds of clients from the creditors of their attorneys. He asserts that under the circumstances of this case, any danger to the Con-Tech fee was negligible and the violation was therefore of little significance. The purpose of the rule is not so limited. "The controlling question, . . . is not whether any harm or

damage resulted to the particular clients from petitioner's handling of their affairs. . . .'' The rules are designed to establish ethical standards for the Bar and to ''prohibit unprofessional conduct.'' (*Higgins* v. *State Bar*, 46 Cal.2d 241, 246 [293 P.2d 455] ; see *McKinney* v. *State Bar*, 62 Cal.2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425].) ▮ It is also immaterial that petitioner may have been ignorant of the provision of rule 9 that he violated. Where an attorney is charged with violating his oath by negligently failing to discharge his duties to ''the best of his knowledge and ability'' (Bus. & Prof. Code, § 6067), a mistake of law made in good faith may be a defense (see *Call* v. *State Bar*, 45 Cal.2d 104, 110-111 [287 P.2d 761]), for section 6067 recognizes that attorneys are not infallible and cannot at their peril be expected to know all of the law. In contrast section 6077 proscribes any wilful violation of the Rules of Professional Conduct and does not make knowledge of the rules an element of the offense.

We conclude that petitioner was guilty of a wilful violation of rule 9.

Petitioner was found guilty on two counts of soliciting bribes, in one case from Daniel Cohn, a real estate developer, and Robert Light, an attorney and a home builder, and in the other case from Bill Asawa, a real estate broker. In each case the State Bar contends that petitioner acted in concert with Councilman Denni, of the Cypress City Council, who conducted the initial negotiations and later involved petitioner in the solicitation of the bribes.

In 1960 Cohn, acting through the D and E Corporation, which he owned, bought a 35-acre tract of land in Cypress. Arrangements were made with a closely affiliated company, Emblem Homes, for the construction of single-family residences. Light, who was Cohn's attorney as well as president and principal stockholder of Emblem Homes, applied for a use variance from the Cypress City Planning Commission. After the commission denied the application on November 3, 1960, Light appealed to the city council, which on the 14th of November took the matter under consideration. On November 29, the council granted the variance but attached a series of conditions, the most significant of which required the developers to have their drainage plans approved by both the city engineer and the city council.

During the latter part of 1960, Cohn also commenced negotiations with Denni about the possibility of D and E purchasing 15 acres of land owned by Denni and 41 acres owned by

Denni's parents. Although there is a conflict in the evidence as to whether an oral agreement was made with respect to the purchase and sale of the 15 acres, it is clear that no sale was ever completed. On March 20, 1961, Cohn and Denni arranged to meet at the Water Wheel Restaurant in Anaheim where Denni was to have lunch with Councilmen Baroldi and McCarney and the city manager. According to Cohn, at this meeting Denni took him aside and told him that he should purchase Denni's 15 acres. When Cohn refused, Denni stated that the drainage on the proposed subdivision was wrong and that the five-man council would not give final approval to the variance unless Cohn purchased the 15 acres for $15,000 an acre. If he agreed to the transaction, "the boys"—Baroldi and McCarney—would acquiesce in the use variance. According to Denni, he took Cohn aside to accuse him of failing to fulfill his oral agreement to buy the 15-acre tract, and when Cohn chided him on his negotiating innocence, Denni became angry and said, "I will never vote on another thing that you have. Unless I can block it."

On April 17, Light and Cohn submitted a drainage plan to the city council that had been approved by the city manager and the city engineer. Two councilmen voted for its acceptance but Denni, Baroldi, and McCarney voted against it. On May 15 the city council again took up the drainage problem on the Cohn-Light tract of land. It decided to postpone any further consideration of possible solutions until a master drainage plan could be established for the area in which the tract was located.

On June 8 Light made an appointment to see petitioner on that day. Light testified that he arranged the meeting because Denni had sent him information through one Ramon Fajardo that final approval for their zoning change would cost $20,000 and that all further dealings should be carried on with petitioner. These statements were confirmed by Fajardo. According to Denni, Fajardo offered to attempt to sell Denni's 15-acre tract to D and E with whom he said he had some influence. Remembering his prior experiences with Cohn, Denni agreed but only reluctantly. When Fajardo later told him that D and E was again interested in making the purchase, Denni told him to tell D and E that any negotiations would have to be undertaken with petitioner.

At 2 p.m. on June 8 Light arrived in petitioner's office and took a seat in the reception room. Shortly thereafter, Denni arrived and was ushered into petitioner's library. A few

minutes later, Light was brought into the library. What was discussed and what transpired at the meeting is sharply disputed. According to Light, the three men engaged in a brief discussion covering sundry unrelated topics and then Denni requested that Light remove his coat. Light refused. Petitioner and Denni then left the room in that order. Several minutes later, petitioner returned and brought Light into his office. Denni again requested that he remove his coat. Light agreed and noticed that when Denni took it he "felt it quite a bit." Denni told him that to receive final approval on their zoning change, Emblem Homes and D and E would have to pay $20,000, some of which would be used to defray the expenses of certain councilmen fighting a recall action.[2] Light was to pay the money to petitioner on the following day, and if the zoning results were unsatisfactory the money would be returned. Denni then turned to petitioner who had been present during the entire discussion and said, "You will handle this like them others." Light told Denni and petitioner that he would have to discuss this transaction with his principal and that he thought $20,000 was a lot of money to pay. Thereupon Denni reduced the request to $15,000. Light departed and informed Cohn of the proposed arrangement. On June 9 Light called petitioner and told him that neither he nor his principal could accept the offer. Petitioner replied that "he understood, that he hoped that I would not think this was his idea, and he made the statement, 'We lawyers often work in gray areas.'"

Denni testified that he received a phone call on June 8 from petitioner asking him to come to the office and meet with a representative from D and E concerning the sale of his 15-acre tract of land. He and Light conversed first in the reception

[2]Denni was elected to the City Council of Cypress on April 12, 1960. In August 1960, a recall petition was filed against Councilmen Baroldi and McCarney. Apparently, the signers of the petition wished to include Denni but could not do so since he had not been in office for six months. (Elec. Code, § 27500.) Petitioner was employed by Baroldi and McCarney, and he sought an injunction to nullify the recall proceedings. Late in 1960, the trial court denied the injunction. A Los Angeles law firm was employed for the appeal, since it was felt that petitioner did not have sufficient experience. McCarney testified that when he protested that he could not afford the expense of an appeal, Denni said that he would take care of the bills. According to McCarney, Denni said he would spend $50,000 to fight this recall. This remark was discounted by McCarney, however, since Denni was prone to make "superlative statements." Denni testified that he agreed to collect the funds needed for an appeal but never mentioned $50,000. In response to a question concerning his motives in aiding Baroldi and McCarney, he stated "Other than fellowship, would be the only thing I sensed, perhaps an obligation."

room, then in the library, and finally in petitioner's office. Petitioner was not present during the entire conversation, which dealt with Denni's 15 acres and not Emblem Homes' variance. Light was not asked to remove his coat. Eventually he and Light got into a heated argument and Light even threatened to damage him in his dairy business. Petitioner's version of the meeting corresponded to Denni's explanation. He also said that he had received several phone calls during the meeting and had left the office on each occasion to receive them. As Denni and Light left the office, each made insulting remarks to him about the other. On June 9 petitioner spoke to Light about D and E's refusal to buy Denni's 15 acres but said nothing about lawyers' working in gray areas. Petitioner's secretary testified that the meeting had been noisy, that Denni had been shouting, and that petitioner had left his office several times in order to answer phone calls.

Light testified that shortly after the June 8 meeting, the problems that D and E and Emblem Homes were having in obtaining a variance ended. Light learned that officials in the nearby town of Westminster had been arrested for their activities in zoning matters. He then placed his zoning application on the city council's agenda for its June 19 meeting. Although there had been no change in drainage proposals since May 15 when the matter was first postponed, the council, by a four to nothing vote—Denni abstaining because he was an adjacent property owner—gave full approval to the variance. According to Fajardo, at approximately the same time he became aware of the Westminster affair and, in a state of concern about his own role in dealing with Light, called petitioner, who told him not to worry because the transaction he had helped arrange had never been completed.

During this same six-month period in 1961, petitioner and Denni also became involved with Bill Asawa, a real estate broker. Asawa represented one Musara "Muzzy" Morita, who owned a 35-acre tract in the City of Cypress and had arranged a complex multi-party transaction for disposing of the land. A July 9, 1961, deadline had been established for completing the transaction and one of the conditions that Morita had to meet before that time was the procurement of a zoning change to permit residential development on land then classified as agricultural.

On April 6, 1961, the Cypress City Planning Commission approved the Morita application for an amendment to the zoning ordinance. On April 17, the city council reviewed this

action and by a three to two vote—Denni, McCarney, and Baroldi comprising the majority—rejected the application. On May 15 the council, after listening to Asawa plead the case for approval of the zoning change, decided to postpone any decision apparently for a maximum period of 120 days, during which time the question of establishing a school site on the Morita property could be resolved.

On May 16 Asawa met with Denni and discussed drainage and school site problems. The testimony is in conflict about how or why petitioner's name was brought into the discussion and who was responsible for making an appointment for Asawa to meet petitioner at 4:30 p.m. on that day. According to petitioner, after Asawa arrived, he asked petitioner to represent the Morita group in obtaining a zoning change from the Cypress City Council. Asawa explained that Morita was having difficulties because no provision had been made for locating a school either within or near the subdivision and because agreement could not be reached on an adequate drainage plan. Petitioner then raised the question of a fee and told Asawa that it could be based on time spent or on the contingency that satisfactory results would be obtained. Asawa said that he preferred the latter method, and petitioner stated that his contingent fee would come to $21,000.[3] Asawa told petitioner that he wanted to check with his principal and would get in touch with him in the near future.

Asawa's testimony presents a sharp contrast. He testified that he was ushered into petitioner's office and asked if he knew who the power on the city council was. When he said Denni, petitioner inquired about the number of acres in the Morita tract. Asawa answered 35 and petitioner said, ''Let's see. 35 times 6; that is 21,000.'' Petitioner told him that the sum would have to be paid in cash and would be distributed to those he represented, one of whom was Denni. The money would be used to pay bills arising out of the recall proceedings. If the $21,000 were paid, the school issue would be dropped. Asawa left, stating that he had to discuss the proposition with his principal. On May 18 petitioner called him and

[3] In explaining how he arrived at this sum, petitioner presented two different theories. First, he stated that since he knew the increase in property value in Cypress caused by rezoning land from agricultural to residential use was $6,000 an acre, he decided to charge 10 percent of the increase or $600 an acre. Later he said that he chose such a high fee because he knew who opposed Asawa and that convincing them to vote for the zoning change might damage petitioner's political reputation and his community standing.

asked if a decision had been reached. Asawa replied in the negative. On May 21 petitioner called again and asked Asawa to come to his office.[4]

About May 23 Asawa went to petitioner's office. According to Asawa, he asked petitioner about a reduction in price and the terms of payment. Petitioner stated that he could check with his principals about the amount but that the payments should be in cash, one-half prior to the council meeting of May 29, and the remainder after the second reading of the map at the next subsequent council session. According to petitioner, Asawa asked if the fee could be reduced. Petitioner replied that this contingent fee was only the equivalent of Asawa's broker's fee but that it could be reduced if a retainer were paid immediately.

Representatives of the district attorney's office got in touch with Asawa before he saw petitioner again. They were investigating reports of bribery in Cypress City in connection with rezoning matters and asked Asawa to cooperate with them. He agreed and on June 6 called petitioner and made an appointment to see him later that day. Before leaving for petitioner's office, he was equipped with a transmitting device. According to Asawa, after he began reviewing the proposed transaction with petitioner and asking if payments could be by means other than cash, petitioner asked him to stand and open his coat. Petitioner ran his hands over Asawa's body but apparently did not find the transmitting equipment. When the conversation resumed, petitioner stated that the money could be paid by check and would be used for attorney's fees. Asawa stated that "this is a little bit different than what we discussed about prior to" and petitioner said, "This is correct." According to petitioner, Asawa began the conversation by asking about the size of the fee and the methods of payment. Petitioner explained how retainers and contingent fees operated and said a check would suffice. When Asawa asked if petitioner's client in this affair was Denni, petitioner replied that he had represented Denni in other matters but that Asawa was his client in this transaction. Asawa then raised the question of cash payments again, and petitioner became suspicious and asked Asawa to remove his coat. Asawa refused, and petitioner opened Asawa's coat and scrutinized

---

[4]Petitioner stated that during the middle of May he had several phone conversations with Asawa. He testified, however, that the calls were all placed by Asawa and that it was Asawa who requested another meeting.

him. He saw nothing unusual and after several more minutes of conversation, the meeting ended.[5]

In the week following his meeting of June 6 with petitioner, Asawa had several long discussions with Denni. According to Asawa, Denni offered to reduce the sum needed to secure the zoning change. According to Denni, these discussions were primarily about the problem of locating a new school site in the City of Cypress. During one of the conversations, he advised Asawa that petitioner was quoting too high a fee for his services and even called petitioner to inform him that his charges were exorbitant. City Manager Robert Rogers, who attended one meeting between Asawa and Denni, testified that the conversation dealt only with the problem of locating a school on or near the Morita tract of land.[6]

On June 19 the rezoning application for the Morita tract was again submitted to the council. It was approved by a four to nothing vote with Denni abstaining. The school problem was solved by an agreement to the effect that if property were taken for a school site, the school district would pay the subdivider the same price that he had paid to the property owner. This tentative approval came too late, however, to obtain a final council decision before the July 9 deadline for closing the escrow agreements. As a result, Morita's land was not sold and Asawa did not receive a commission.

In assessing this wealth of testimony, we can isolate only a few undisputed facts. Before his involvement with Light, Asawa, and Bentley, petitioner had represented Councilman Denni in various legal matters. Councilmen Denni, Baroldi, and McCarney were working together to fight the recall of the latter two men. Denni, who was not subject to recall, had taken it upon himself to raise the money to appeal from the judgment refusing to enjoin the recall. He did so partly because he felt that he had an obligation to the other two men. Petitioner had been engaged by Baroldi and McCarney at Denni's suggestion to represent them in one phase of their fight. The votes of Denni, Baroldi, and McCarney coincided on

---

[5]Although a tape recording was made, apparently it was too unintelligible to be introduced into evidence.

[6]Rogers testified that at a later chance meeting, Asawa told him in effect that if Rogers would use pressure, he could obtain a piece of land owned by the Standard Development Company that could be used for the double purpose of providing a site for a school and solving the drainage problems on the Morita tract. Rogers also stated that after Fajardo testified before the grand jury that indicted Denni and petitioner, Fajardo told him that he had to testify or else face deportation proceedings.

all three of the zoning changes at issue. Light, Asawa, and Bentley got in touch with petitioner on the basis of suggestions from Denni. The fees that petitioner admitted he charged Con-Tech and quoted to Asawa are calculable at $600 an acre and coincide with the sum that Light claims was originally asked from him. The fees themselves are markedly higher than any that petitioner had charged previously. Denni admitted that his vote on rezoning matters could be influenced by personal considerations. Petitioner searched Asawa for a recording or transmitting device. The city council changed its position and finally approved the Asawa and Light rezoning applications, although there was no appreciable change in the circumstances surrounding the specific tracts and the plans for their development. No bribe was paid, however, to receive the council's approval.

With the possible exception of petitioner's searching Asawa, these undisputed facts are as consistent with petitioner's claimed innocence as with his alleged guilt. Moreover, in view of Asawa's persistent questioning about a cash fee, petitioner's suspicion and concern that Asawa might be surreptitiously recording or transmitting their conversation is too ambiguous to constitute persuasive evidence of consciousness of guilt. Accordingly, in determining whether the charges of soliciting bribes are sustained, we must rely entirely on testimony that is in total conflict. Moreover, we are faced with contradictory assessments of this testimony by the jury and the local administrative committee that heard and saw the witnesses. We are unable to determine from our own evaluation of the record that any of the inconsistent testimony is incredible on its face or that the jury's determination is entitled to less weight than that of the local committee. Since we must resolve all reasonable doubts in favor of the accused, we conclude in the light of all the circumstances that the charges of soliciting bribes have not been "sustained by convincing proof and to a reasonable certainty." (*Brawner* v. *State Bar, supra,* 48 Cal.2d 814, 818.)

For petitioner's wilful violation of rule 9 we believe that a public reprimand is sufficient. This opinion shall serve as such reprimand.